2023 IL App (1st) 192463

SECOND DIVISION

December 19, 2023

No. 1-19-2463

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 11565(01) |
| | ) | |
| SHANNON WILLIAMS, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Shannon Williams was found guilty of first degree murder and armed robbery in connection with the 2014 shooting death of the victim, Trovolus Pickett. Defendant was sentenced to consecutive prison terms of 30 years' for first degree murder with a 25-year firearm enhancement, and 6 years for armed robbery, with a 15-year firearm enhancement, for a total prison term of 76 years. In this appeal, defendant contends (1) that the trial court erred in granting the State's pretrial request for an extension of the speedy trial term, (2) that the court improperly allowed hearsay evidence and evidence of other crimes pursuant to the

course of investigation exception, and (3) that the prosecutor improperly relied on that evidence in closing as substantive evidence of defendant's guilt.

¶ 2      The record shows that defendant was arrested on May 30, 2014. He was indicted on July 2, 2014, and arraigned on July 11, 2014. At that point, defendant, through counsel, began agreeing to continuances. The case was continued multiple times by agreement, until it was eventually set for trial on July 23, 2018. On that date, the State answered, "not ready," explaining that it was "missing an essential witness." The defense answered "ready" and filed a speedy trial demand. Over the next 2½ months, the case was continued several times on the State's motion. On October 2, 2018, with seven days remaining in the speedy trial term, the State advised the court that it intended to file a motion for an extension of the term.

¶ 3      The next day, October 3, 2018, the State filed a written motion to extend the speedy trial term, contending that, despite their best efforts, it had been unable to personally serve Mark Hall, the sole remaining eyewitness to the murder of the victim. The State explained that Hall had previously cooperated with the investigation, identifying defendant in a photo array and providing a video statement and grand jury testimony regarding the incident. The State, however, had since unsuccessfully attempted to locate and serve Hall. The State further stated that Hall had been arrested by the Cicero police on September 12, 2018, and that he had an October 9, 2018, court date in the Maywood courthouse, at which the State's investigators would be present to serve him. The State further asserted that it intended to request a warrant and enlist additional fugitive units to assist in Hall's apprehension if he failed to appear in court. Attached to the motion were reports from Investigator Joe Thomas, detailing his efforts to locate and serve Hall and outlining his contacts with Hall's friends, family, and associates and his surveillance of Hall's associates and the residences associated with Hall.

¶ 4    That same day, the parties appeared before the court. The prosecutor explained that "[o]ur office has outlined and attached exhibits and has been tracking Mr. Hall for a period of months. Attached are a number of reports from my investigator Joe Thomas outlining extensive contacts that he has made with Mr. Hall's family, friends, and associates. He has repeatedly set up surveillance on addresses known by Mark Hall to frequent.

Mark Hall has a child with an underaged girl. He has set up surveillance on that residence, as well as spoke with the mother of Mark Hall's—the mother of the mother of Mark Hall's child. However, he is hardly the father of the year. He has abated attempts to be served at any of the residences known to him.

On September 12th he was arrested in Cicero in the case in which he was a passenger in a vehicle, which cannabis was admitted [*sic*]. He fled the traffic stop but was placed in custody after a struggle with the Cicero police officers, and narcotics were found in his sock. He is charged with possession of a controlled substance with intent.

However, before my investigators could get to him he bonded out as he got a $1000 bond, posted [$]100, and cleared bond court before my investigators could get to county jail.

He gave a different address than he had in the past in those police reports, different from his driver's license. However, when I provided that address to my investigators because I got the police reports faster than they did, they were already aware of it and indicated that was his father's address, and they had already been to

that house, and it wasn't really clear that he ever laid his head on any regular basis at that residence.

We have also provided pictures of Mark Hall, as well as copies of our subpoenas to tactical teams that operate on the west side to no avail.

On his narcotics case Mark Hall will be in court in Maywood on Tuesday. That will be outside our term. However, it's highly likely that he will either appear and be served on this case or alternatively a warrant will be issued. If a warrant is issued then it will be enforced by any law enforcement agencies, and I have a number of fugitive teams prepared to go and already basically planning to go after Mark Hall at that time.

We believe we have been diligent. He is certainly a material witness, and as such we believe we are entitled to a 60-day extension of the term in this matter and that the likelihood that we will obtain service of Mr. Hall is great.

What we're contemplating is that we would ask the Court leave to serve Mark Hall for October 12th for a trial date but not a trial date to see if he in fact did appear. If he appeared and received service in Maywood on the 9th and he appeared here on the 12th then we would know he would be advised to come to court. We were talking about the 16th, the following week for trial, or alternatively this Court would issue a warrant for his arrest, and we would send the fugitive teams out to obtain him by the next week."

¶ 5    Defense counsel responded that "due diligence [wa]s really the issue here." Counsel argued that the reports attached to the State's motion did not show any efforts to serve Hall with a subpoena before the July 23, 2018, initial trial date. The court interjected that July 23, 2018, was

the first date that the demand was filed, and counsel agreed, "aside of course from the very beginning of the case." Counsel further argued that while the reports indicated that the investigator conducted surveillance at two purported residences of Hall, the report did not detail how long the investigator remained at the locations or what efforts were made to make contact. Defense counsel also noted that it was "significant" that Hall was in custody for the Cicero case and that there was nothing that "flagged" or "indicated that Mr. Hall was somebody that [the Cook County State's Attorney] w[as] interested in talking to." Defense counsel argued that he "d[id]n't think this rises to the level of due diligence. So we would object to any extension being granted on this matter at this point."

¶ 6       The State replied that the reports were

"only summaries of the [investigator's] efforts. This remains with the investigator since it was assigned. He goes out and goes in regularly, checks on the addresses, checks on the databases, and follows his associates. Some things are soft pedaled in the reports, including the information he is receiving from the grandmother of his child as far as efforts to serve Mr. Hall.

[The investigator] has been out to [Hall's] father's residence, which is the address in the last arrest report to no avail. He conducted surveillance over the last two weekends to no avail, including surveilling the associates as he indicated in his reports that he was arrested with and speaking with them.

He also kept that car under surveillance for two separate occasions. However, we did not have a great expectation that Mr. Hall would return to that car. He was arrested in the car as a passenger. He didn't own it. We had planned to have the car under surveillance. If it was a car that he owned I guess it would have to be

5

unimpounded from Cicero. However, he wasn't the owner or the driver. So that was also a dead-end.

The efforts have been constant and ongoing since, as well as notifying the districts and the tact teams with pictures. I personally provided copies of subpoenas of Mr. Hall to tactical teams. And third more we did have a stop order out that would have allowed our investigators to be aware in the city of Chicago if he was placed in custody, but we did not have one that would have tripped him in Cicero where we would be notified of his arrest."

¶ 7   Following the above argument, the court granted the State's motion, finding:

"I believe that the State has made a *prima facie* case for due diligence in this regard.

In addition to the exhibits tendered on the motion and representations made by the State regarding their efforts in that regard to locate him, I believe that considering the case law in this particular area that there is sufficient due diligence then to—for that particular factor in granting the motion.

The second issue is as to good cause shown, which includes the diligent standard, and taking all of that into consideration I think the State has established good cause particularly in light of the fact that as represented to the Court and indicated in the exhibits this person, this witness was arrested, and there is a good possibility that he can be served on the next court date, which is my understanding is October 9th in Room 213 in Maywood.

That would be beyond the demand date, but I believe that there is a great likelihood based upon the representations of the State that he could be served at that particular time.

So in considering the other arguments made by the State and considering the fact that there is a particular date in which he is to appear in court and can be served by the State, I believe they've established good cause. So I'm going to grant the motion for the extension of 60 days."

¶ 8      On October 9, 2018, the State served Hall at his court date with a subpoena to appear in this matter on October 12, 2018. Hall failed to appear on October 12, 2018, and the trial court issued a warrant for his arrest and set a status date of October 16, 2018. On that date, the State informed the court that Hall had not yet been arrested. Defendant moved to dismiss the case, and the trial court denied the motion.

¶ 9      At the next status date, on October 29, 2018, the State informed the court that Hall had been arrested. The court scheduled the case for trial on November 13, 2018, which was then continued three more times—twice on motion of the State and once by agreement—to December 4, 2018.

¶ 10      The trial began on December 4, 2018. Before the start of evidence, the court heard argument on motions *in limine*. In particular, the defense explained that it had been tendered reports in discovery indicating that, on April 24, 2014, police responded to a "shots fired" call and engaged in a car chase that ended with the car crashing into school property. The police apprehended three occupants who fled the car—Navi Ray, Andre Clifton, and Lonnie Hutcherson—and retrieved a firearm from the car that was similar to the one used in the offense. The defense requested that the court prohibit the prosecution from entering the dash-cam video and the substance of the call received by the police. Additionally, if the occupants of the car did not testify at trial, the defense asked that the court also prohibit any evidence or inference that the occupants had told police that defendant was present in the car on April 24, 2014, that defendant

possessed the weapon that was found therein, or that defendant was involved in the armed robbery and murder of the victim.

¶ 11 The court initially agreed with the defense that the fact that police were responding to a "shots fired" call was "obviously" irrelevant. The State then explained that it wanted to introduce that police were responding to a call of "shots fired" to explain the high-speed pursuit recorded on the dash-cam. The prosecutor explained:

"It's actually a very intense car chase that would only be justified by that type of event. If the officers have to remain silent on that—we're talking cars doing figure 8s, driving over medians. It ends actually in a car unable to navigate a turn and c[r]ash into a school sign. They go through two school zones. If the jury were led to believe that this could be a ticket or a traffic ticket *** [i]t would actually put the officers at a serious disadvantage in the climate environment we are. [*sic*]"

¶ 12 The court then addressed the prosecutor:

"THE COURT: This is brought in for purposes really of indicating to the jury the course of the investigation—

PROSECUTOR: Correct. *** Why these officers did what they did."

¶ 13 The prosecutor suggested that the defense's motion was "best handled simply by a limiting instruction that tells [the jury] how to consider that."

¶ 14 The court then stated, "Here's what I'm going to do. I'm going to allow the State to indicate the call, with a limiting instruction to the jury that they're not to consider it for any other purpose other than why this chase took place. Is that agreeable then?" The defense noted its objection, and the court continued:

"COURT: Sure. I understand. But I think that's appropriate. There is some probative value to it as the State has indicated. But I don't want it to be unduly prejudicial. I think the limiting instruction would deal with that particular aspect of it. So I would just indicate to the jury that you're only to consider the fact that this was a shots fired call in considering what you're about to see."

¶ 15     The defense then presented argument about the dash-cam video.

"DEFENSE COUNSEL: There is dash[-]cam video that would show four people running from the vehicle. Three people are apprehended and one is not apprehended. A search of the vehicle, according to the police reports, indicates that some marijuana—which is not really relevant to our situation, at least not to [defendant's] situation in the case. It may be relevant to these other folks in the car to our impeachment of their accounts. But importantly, a gun is found in the car. That gun is found to have similar tool marks to the weapon that was used in the shooting of Mr. Pickett.

Conversations were had between the police and the other three people in the car who were apprehended. What we are seeking to keep out is any content of those conversations either explicitly or implicitly. *** [N]one of those witnesses, to our understanding, are going to testify. *** So it's our position that none of the substance of their testimony should come in or their statements should come in because the substance of their statements would tend to implicate [defendant] and we would not be able to confront that in any way. We could not cross-examine them.

So it's our position that nothing should come in including who the fourth person in the car was, that the fourth person in the car was the person who shot Trovolus

Pickett, that the fourth person in the car somehow possessed the firearm, and that clearly that [defendant] was the fourth person in the car.

Judge, given that that's our position, I think the logical conclusion is nothing from this chase should really come in, even the video of the chase. What you have—

THE COURT: The gun is recovered.

\*\*\*

DEFENSE COUNSEL: The weapon is recovered. But there really is no admissible nexus between that weapon and [defendant] unless—

THE COURT: No. I understand. Okay.

DEFENSE COUNSEL: Unless someone testifies to it.

THE COURT: Yeah.

\*\*\*

DEFENSE COUNSEL: I think that given that there is no nexus here between anyone saying that [defendant]—any competent evidence saying [defendant] was the one who was in the car, possessed the gun, did the shooting, I don't believe that it has any relevance. And certainly what limited probative value it would have would be outweighed by the prejudice."

¶ 16    The court then asked the State for its response. The prosecutor replied, "As far as the substance, we would have no intention of entering the substance of those conversations. We know where the line is and we have no intention of stepping over it." The prosecutor continued that "the course of conduct exception is settled law in Illinois" and that "without going into the substance of the conversation," the fact that a witness identified a defendant was a "permissible [and] reasonable inference for [the jury] to draw. \*\*\* Everybody's been advised to not go into these

substantive conversations. It is going to be, I had a conversation with a person. What did you do next?"

¶ 17     The court agreed that was "fine," and defense counsel responded:

"DEFENSE COUNSEL: Judge, given that that's your ruling, what we would ask is that it be limited to just that, not that you had a suspect that you were looking for or that you had information regarding who was in the car.

THE COURT: That would go a little too far.

DEFENSE COUNSEL: That's what I'm—

THE COURT: Yeah.

DEFENSE COUNSEL: That's what I'm citing. That would be more than—

THE COURT: Sure. Absolutely. I agree.

DEFENSE COUNSEL:—is appropriate.

THE COURT: I agree with you on that. So it's limited to what the cases indicate regarding course of investigation."

¶ 18     When the trial commenced, Officer Patrick Martino testified that at 11 p.m. on April 18, 2014, he responded to a call of a person shot near 5246 West Congress Parkway. When he arrived at the scene, Officer Martino saw the unresponsive victim lying in the gangway under a motion sensor light in a pool of blood with money on the ground around him. Officer Martino secured the scene and called for additional units and an ambulance.

¶ 19     Officer Ted Jozefczak testified that on April 18, 2014, around 11:15 or 11:30 p.m., he went to the 5200 block of West Congress Parkway in response to a shots fired call. He spoke to Terrell Robinson, whom he had met before, and who introduced him to Mark Hall. Officer

Jozefczak provided information about his conversations with Robinson and Hall to officers at the scene.

¶ 20    Forensic Investigator Brian Smith testified that, in the early morning hours of April 19, 2014, he and a detective did "a walk-through" of the crime scene at 5246 West Congress Parkway, where they placed markers next to possible evidence, videotaped the scene, then photographed and recovered the evidence. Investigator Smith identified the video and photographs of the crime scene, including two cartridge cases that were recovered. Investigator Smith also identified a photograph of a floodlight on the building at 5246 West Congress Parkway.

¶ 21    Officer Jan Kenar testified that around 4:12 p.m. on April 24, 2014, six days after the murder, he and his partners were in a marked police vehicle in the area of Marquette Road and Stony Island Avenue, when they received a "shots fired" dispatch. No limiting instruction, as was discussed prior to trial, was given. Officer Kenar received a description of a blue Dodge Durango with license plates L-O-R-A-Y. The officers drove around the area and came across the vehicle. They attempted to pull over the vehicle by activating the police car's lights and sirens, which also activated the dash-cam. The driver of the Dodge did not pull over; instead, it ran a red light on Marquette Road before turning north onto Stony Island Avenue. The driver then accelerated, ran a stop sign, and passed cars on the left driving toward oncoming traffic. Eventually, the driver of the Dodge attempted to turn right, but lost control. At the end of the chase, the vehicle crashed into a fence. Officer Kenar identified a DVD that contained the dash-cam's footage of the car chase, which was published to the jury.

¶ 22    After the crash, Officer Kenar observed who he believed to be the driver exit the vehicle and flee. Officer Kenar pursued on foot and apprehended a man named Navi Ray. Officer Kenar later learned that his partners pursued and apprehended two other occupants—Lonnie Hutcherson

and Andre Clifton. The three men were arrested and taken to the Area North station, where they were interviewed and charged with possession of cannabis. At the station, Officer Kenar reviewed the dash-cam video and learned that a fourth individual had also exited the Dodge and had not been apprehended.

¶ 23        Officer Sajit Walter testified that around 4 p.m. on April 24, 2014, he and his partners were on patrol in the 3rd district when they responded to a call to assist in a pursuit. They saw a patrol car in pursuit and followed it until they came upon a blue Dodge that had crashed. Officer Walter helped place Clifton into custody. He and his partner searched the Dodge and recovered drugs from the front and a Hi-Point 38-caliber, semi-automatic pistol from the rear passenger seat.

¶ 24        Detective Mary Nanninga testified that sometime after midnight on the day of the offense, she was assigned to investigate the victim's homicide.[1] Detective Nanninga went to the crime scene and canvassed the area by knocking on doors in search of witnesses, looking for security cameras on buildings, and looking for stray bullet damage. She spoke to the officers on the scene, conferred with forensic investigators, and requested 911 recordings.

¶ 25        About a week later, on April 24, 2014, Detective Nanninga learned that officers had information about the victim's murder. She went to the Third District station and learned that Third District officers had recovered a 380 Hi-Point firearm, which she knew to be the same caliber as the cartridges recovered from the scene of the victim's murder.

¶ 26        Detective Nanninga separately spoke to Clifton, Ray, and Hutcherson at the station. Afterwards, Detective Nanninga returned to Area North and assembled a photo array, which included a photo of defendant, whom she identified in court.

---

[1]Detective Nanninga testified that she had been promoted from Detective to Sargeant two years prior to her testimony, after her involvement in the investigation into this offense. We will refer to the witness by her title at the time of the investigation at issue.

¶ 27    The next evening, on April 25, 2014, Detective Nanninga located Mark Hall near his residence. Hall agreed to go to the station with Detective Nanninga and stayed there until the early morning hours of April 26, 2014, when officers drove him home.

¶ 28    Later that day, Detective Nanninga telephoned Hall. Detective Nanninga was looking for a second witness, Terrell Robinson. Detective Nanninga then returned to the block where Hall lived and found Hall and Robinson, who both returned to the station with her. At the station, Detective Nanninga spoke with Robinson alone and then again with Assistant State's Attorney (ASA) Patrick Waller.

¶ 29    Mark Hall testified that, at the time of trial, he was 21 years old and lived with his mother on the west side of Chicago. He testified that he was currently on house arrest for failure to comply with a subpoena. Hall agreed that he had been served a subpoena, that he did not come to court, and that he did not want to do so. Hall also testified that he had pending criminal charges for possession, manufacture, and delivery of a controlled substance and for resisting arrest.

¶ 30    On April 18, 2014, around 11:15 p.m., when Hall was 16 years old, he was on the 5200 block of Congress Parkway near his cousin Terrell Robinson's home. Hall was with Robinson and their friend, the victim, Trovolus Pickett. The three walked from Robinson's home to a gas station at Jackson Boulevard and Laramie Avenue. As they walked, a black male crossed the street, walked towards them, took a gun out of his pocket, and told them to go in the nearby gangway. Hall, Robinson, and the victim went into the gangway.

¶ 31    In the gangway, the man faced the boys, who stood next to each other—the victim in the middle with Hall to his right, and Robinson to his left. The man said, "give me everything." Hall testified that they gave him their money, but Hall could not recall how much money he turned over. Hall thought the man pointed his gun at the victim the whole time, but could not remember

as it was "many years ago." Hall testified that after they handed over their money, Hall heard two shots "back to back" and saw that the victim had been shot in the head. Hall testified that he did not recall if Pickett said anything before the man shot him.

¶ 32    Hall testified that he ran out the back of the gangway, hopped a gate, and then circled back to the scene of the shooting. Hall saw the victim on the ground, bleeding from his head, but still breathing. Hall called 911 and stayed with the victim until the police and ambulance arrived. Hall saw the ambulance take the victim away and the police putting up crime scene tape. Hall said that neither he nor Robinson talked to police that night. A few hours later, Hall learned that the victim had died.

¶ 33    When asked about how well he could see the offender, Hall testified that there were "lights, but *** you can't really see because it was dark in the gangway." He agreed, however, that there were city lights on the sidewalk and the street, and the house lights on along the way. Hall also thought there was a light in the gangway that lit them up "a little bit." Hall described the offender as black, about 22 or 23 years old, with "caramel," "lighter," skin, short dreads hanging on his forehead, and wearing a black hoodie. Hall identified a sensor light in a photo of the gangway that was illuminated during the offense. Hall did not recall if the light was on before he went into the gangway, but he "kn[e]w it was on when he was in there." Hall said that the man shot the victim beneath the sensor light.

¶ 34    Hall further testified that about a week later, on April 25, 2014, Hall was drinking on his grandmother's porch when homicide detectives arrived. They handcuffed and arrested Hall, then took him to the station. Hall testified that the detectives did not tell him why they wanted to see him and that, for a few hours, they put him in a room at the station, where he fell asleep.

¶ 35 Hall testified that, later, two or three detectives returned to speak with him, and they told him that there were witnesses who identified Hall and Robinson as the perpetrators of the victim's murder. Hall told them that was not true. The detectives then showed him a group of five black and white photos. Hall testified that when the officers laid out the photo array, an officer touched one of the photos and said "I ain't going to tell you who it is." Hall identified defendant in-court as the person whose photo the officer touched. Hall chose defendant's photo out of the array by touching it.

¶ 36 In court, he identified a photo as the one of defendant he identified at the station. At first, Hall claimed that he only touched the photo and that he did not know who wrote the time or circled defendant's face on it. Hall later testified that he signed and circled the photo and said that he forgot that he signed it. Hall claimed that the officers did not ask him anything before they showed him the array. He agreed that his signature appeared on a photo advisory form, but testified that he signed it after he viewed the photo array. The form stated that Hall understood that the suspect may or may not be in the photo lineup, that he did not have to make an identification, and that he should not assume that the person administering the lineup knows which person is the suspect.

¶ 37 Hall also testified that the officers showed him a second set of five photos, from which he did not identify anyone. The officers took Hall home a few hours later.

¶ 38 Hall further testified that later that day, officers came to Hall's mother's house and took him and Robinson to the station. Hall said that he agreed to return because he "had no other choice." Hall spoke to officers at the station about the victim's murder, and they told him he had to "do a video." Hall testified that one or two people were in the room when he gave a videotaped

statement. Hall stated that the officers again laid down photos, told him to choose the same photo, and told him to say, "something like nobody made [him] do it."

¶ 39     Hall testified that, in his statement, he must have said that the gangway light came on when he walked in because he knew it was on once he was in there, and agreed that he said that the shooter was "real close, [he] could touch him." When asked whether he told the detective and the ASA that the victim said to the offender "on BD you got everything, you got all our stuff," before the offender shot him, Hall agreed that "[i]f it's on paper, then [he] told him that." Hall explained that "BD" meant Black Disciples gang, and that the victim was essentially swearing "on his BD credential" that he gave the offender everything. Hall also agreed that he told the ASA and the detective that the offender shot the victim in the face immediately after the victim said that.

¶ 40     Hall further testified that he told the ASA that the police called him, and that Hall agreed to go to the station to look at photos to see if he could identify the offender. Hall also told the ASA that he signed a photo advisory form before viewing the photo array, and, after viewing the photo array, he identified defendant as the person who robbed him and shot the victim by circling and signing the photo. Hall also told the ASA that the offender took $280 from him. Hall testified that officers drove him home after he made his statement.

¶ 41     Hall testified that the above videotaped testimony was not truthful. He stated that he was only 16 years old and he was "threatened" and "coerced" into making the statement.

¶ 42     Hall further testified that on June 12, 2014, he was standing on a corner when "two homicide cops jump[ed] out," "grabbed [him]," and put him in the "back of the car." The officers brought him in front of the grand jury, where they asked him questions "about what happened that night."

¶ 43      Hall told the grand jury that he, Robinson, and the victim were walking on the 5200 block of West Congress Parkway when a man with short dreadlocks and a gray hoodie crossed the street, pulled a gun, and said, "get in the gangway." He told the grand jury that the man's hood was halfway over his head, but Hall saw the man's face because there were "a lot of lights outside and it [was] light in the gangway." Hall also told the grand jury that he "[c]ould see real good. The light was bright," and the light was even better in the gangway than on the sidewalk. Hall told the grand jury that the offender was "real close" to him, he "could touch him." Hall thought he remembered identifying a photo of defendant as the man who shot the victim. He could not recall if he signed the photo in the presence of the grand jury, but he thought he did because his name was on it. Hall also acknowledged that he told the grand jury that he gave $280 to the shooter, and that the victim said "on BD I gave you everything" after turning over his money.

¶ 44      Hall also testified that he told the grand jury that on April 25, 2014, he agreed to go to the station, answer questions, and look at photos. Hall further told the grand jury that officers gave him, and he signed, an advisory form before seeing the photo array.

¶ 45      At trial, Hall identified the advisory form he signed before he viewed the photos, and which he viewed during his videotaped statement with the ASA and during his grand jury testimony. Hall agreed that his signature appeared on the form three times: he signed it before he viewed the photo array, during his conversation with the ASA, and before the grand jury. Hall did not recall telling the grand jury that he signed the form before he viewed the photo lineup. He agreed, however, that he testified that he looked at the photos after signing the advisory form and telling the detective that he understood it. Hall also testified that, during his grand jury testimony, he identified defendant's photo from the photo array as the man who shot the victim and that he signed and circled the photo.

¶ 46 Hall testified that he told the grand jury he agreed to meet with, and answer questions from, ASA Waller on April 26, 2014. ASA Waller asked him how he wanted to memorialize his statement, and he chose video, which he understood to mean that he would answer the questions he had just been asked while being recorded. Hall acknowledged telling the grand jury that he gave his videotaped statement "freely and voluntarily," that no one made threats of promises in return for his cooperation, and that he was treated well by the police and ASAs he met with.

¶ 47 Finally, Hall testified that he was under the influence of alcohol when he initially spoke to officers in the early morning hours of April 26, 2014. He later clarified that he "was just drinking," but was not "drunk drunk, like *** can't function drunk." Hall stated, however, that he was sober during both his videotaped statement and his grand jury testimony.

¶ 48 Kellen Hunter testified that in 2014, he was the firearm examiner who compared the firearm that was submitted in this case to the fired bullet and two cartridge cases submitted in this case. Hunter determined that the bullet and cartridges were fired from the firearm.

¶ 49 The parties then stipulated that Dr. Kristin Escobar Alvarenga would testify as an expert in forensic pathology and that, on April 19, 2014, she performed an autopsy on the victim, who had suffered two gunshot wounds—one to the left parietal scalp and one to the rear of his neck. Dr. Alvarenga recovered one bullet during the autopsy. Based on her examination, Dr. Alvarenga concluded that the cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 50 The parties also stipulated that on April 19, 2014, Officer Victor Rivera received a fired bullet in a sealed medical examiner's envelope from Dr. Alvarenga, after she performed the victim's autopsy and that the officer inventoried the bullet. The bullet was sent to the Illinois State Police Crime Lab for further testing and analysis.

¶ 51        Finally, the parties stipulated that Hutcherson and Robinson were deceased.

¶ 52        Lawrence Amos testified that around 11:15 or 11:30 p.m. on April 18, 2014, he was at home in the 5200 block of Congress Parkway when he heard two or three gunshots. About 20 to 30 seconds later, Amos looked out his window and saw a dead body in the gangway, across the street, about two houses down. He also saw a black male in a gray or black hoodie in the gangway of the house next to his.

¶ 53        Detective Michael Kennedy[2] testified that, in April 2014, he was assigned to assist in the investigation of a murder that occurred at 5246 West Congress Parkway. Detective Kennedy processed the murder scene and canvassed the surrounding neighborhood. Pursuant to that investigation, Detective Kennedy identified Hall and Robinson as potential witnesses. On April 25, 2014, around 10:30 p.m., Detective Kennedy and his partner, Detective Nanninga, went to Hall's street, hoping to find Hall and Robinson. They located Hall, who agreed to accompany the detectives to the station to assist in the investigation. Detective Kennedy testified that they did not draw their guns, arrest, or handcuff Hall.

¶ 54        Detective Kennedy spoke to Hall at the station around 11 p.m., and Hall agreed to view a photo array to see if he could identify the shooter. Detective Kennedy gave Hall a photo advisory form and went through the content of the form with Hall. Detective Kennedy asked Hall if he had any questions, and Hall said that he did not. Hall signed the form indicating his understanding.

¶ 55        Detective Kennedy then showed Hall the photo array, which included defendant's picture as well as other pictures that had been assembled by searching the police database for people with similar "demographics, complexions, [and] weight" as defendant. Detective Kennedy

---

[2]Detective Kennedy also testified that he had been promoted from Detective to Sargeant following his involvement in the investigation into this offense. Again, we will refer to the witness by his title at the time of the investigation at issue.

put five photos on a table, and Hall pointed to the photo of defendant and said, "there he is," and "that was the guy that shot my buddy." Hall signed, dated, and circled defendant's photo. Detective Kennedy denied placing a finger on defendant's photo or indicating in any way which photo Hall should identify.

¶ 56    After Hall identified defendant's photo, Hall spoke to ASA Denise Tomzak at the station. Hall signed a second photo advisory form and viewed an array of six photos that included photos of Ray, Hutcherson, and Clifton. Detective Kennedy explained that the purpose of this photo array was to either identify or eliminate others who may have been involved in the murder. Hall did not identify any photos in the second photo array.

¶ 57    Around 3 a.m., Detective Kennedy asked if Hall would help locate Robinson. Hall agreed and told the detective that he and Robinson were friends, they "h[u]ng out all the time" and Hall knew where he lived. Detective Kennedy and his partner took Hall home. Detective Kennedy testified that Hall was never handcuffed at the station and that neither he nor his partner told Hall that he and Robinson had been identified as the perpetrators. Detective Kennedy and his partner did not tell Hall that he would be charged with the victim's murder if he did not cooperate. Detective Kennedy described Hall as "very cooperative" and "eager to help." Hall's answers were clear, responsive, and appropriate, and Detective Kennedy saw no indication that Hall was under the influence of drugs or alcohol.

¶ 58    Later that day, Detective Kennedy's partner called Hall to ask if it was "a good time" for the officers to return to Hall's residence and if Robinson was available to speak to them. The officers returned to Hall's home, where both Hall and Robinson agreed to come to the station. After they arrived, Detective Kennedy's partner spoke to Robinson, and Detective Kennedy spoke to Hall. ASA Waller came to the station and spoke to Hall at around 10 p.m. ASA Waller gave

Hall the option of having a conversation with ASA Waller, giving a written statement, or giving a video statement that memorialized their conversation. Hall chose to make a video statement. Detective Kennedy was present for the video statement, which the detective found to be consistent with Hall's prior statements to Detective Kennedy.

¶ 59     Detective Kennedy was then asked if Robinson also gave a videotaped statement. The defense objected and asked for a side bar. Defense counsel objected that the prosecutor was

> "going to imply that the—they took a statement from Mr. Robinson because Mr. Robinson somehow incriminated [defendant]. We don't have any opportunity to cross-examine that. We don't have any opportunity to rebut that. It's unfortunate that Mr. Robinson has passed away. But I don't believe that that enables them to imply what Mr. Robinson said regarding the effects of this case."

¶ 60     The prosecutor responded that it was "part of the investigation." The court ruled, "The objection is overruled. He can ask the one question. Go no further."

¶ 61     The prosecutor then asked, again, whether Robinson also provided a videotaped statement, and Detective Kennedy responded affirmatively.

¶ 62     After the videotaped statements were complete, the officers took Hall and Robinson home, then issued an investigative alert to other law enforcement agencies that they were searching for defendant and Clifton and that they should be taken into custody if encountered.

¶ 63     On cross examination, Detective Kennedy acknowledged that the photo array Hall viewed was comprised of black and white photographs and that Hall never viewed color photographs or a live lineup.

¶ 64     ASA Jamie Santini testified that on June 12, 2014, he discussed the victim's murder with Hall in the ASA's office in the courthouse. Hall was cooperative and his answers to ASA

Santini's questions were responsive and appropriate. After their conversation, ASA Santini brought Hall in front of the grand jury. Before he testified, Hall raised his right hand and swore to tell the truth. Hall told the grand jury that he saw the face of the shooter clearly and identified the photo he had signed of defendant as the shooter. Hall further testified that he signed an advisory form before he viewed the photo array and that no one told him which photo to identify. ASA Santini also testified that Hall was asked if he was under the influence of drugs or alcohol when he spoke to the detectives and the ASA at the station, and he responded that he was not.

¶ 65     ASA Patrick Waller testified that on April 26, 2014, he went to Area North to assist in investigating the victim's murder. ASA Waller met with Detective Kennedy and his partner, then spoke to Robinson and Hall separately. ASA Waller asked both men if they would be willing to make video recordings of their statements. Hall agreed and made a video recording at about 11:10 p.m., with ASA Waller and Detective Kennedy present. ASA Waller took a second video statement after he took Hall's. When asked whose statement was recorded second, the defense objected, and the court sustained the objection.

¶ 66     ASA Waller identified a video recording of Hall's statement, which was admitted into evidence and published to the jury. The ASA also identified an exhibit that included the signed photo array advisory form and the photo array from which Hall identified defendant. ASA Waller testified that Hall again signed the photo of defendant during the video recorded statement. ASA Waller further testified that he had an opportunity to speak with Hall alone and that Hall never advised ASA Waller that officers had threatened to charge him with the victim's murder.

¶ 67     The State rested, and the court denied defendant's motion for a directed finding. The defense rested without presenting any evidence.

¶ 68    During closing arguments, the State argued that Hall's 2014 accounts were more reliable than his trial testimony.

¶ 69    Defense counsel argued that there was no physical evidence tying defendant to the shooting and that the evidence against him amounted to "a single witness who is unreliable who saw a black and white photo array four years ago, never saw a lineup, [and] whose testimony is unsupported by any physical evidence."

¶ 70    In rebuttal, the ASA explained that the "law allows you take what a witness says when they are in an event it's electronically recorded as if they say it from this witness stand" and that the legislature "recognizes that people like [Hall] are going to return to the west side. *** He went home there last night. He will be there today." The prosecutor added, "What [Hall] said during the trial, that's not for your benefit. That's for the benefit of the people out there and the people out on the west side." The court overruled the defense's objection. The State continued, "That [Hall] isn't an informant. That he is not a snitch. That he is not weak." Again, the court overruled the defense objection.

¶ 71    The ASA then argued:

> "ASA: You saw there is an instructions [*sic*] about reasonable inferences that you can draw from the evidence. You are a smart jury. *** On the 24th of April in 2014 this gun was in a car speeding away from the police. We know that later the officers realize there weren't just three people in that car. There were four people in the car and I submit to you the fourth person—-
>
> DEFENSE COUNSEL: Objection.
>
> ASA:—was the defendant.

COURT: It's argument. The jury has heard the evidence. They will only consider the evidence and the reasonable inferences to be drawn from it.

ASA: The three that got caught[,] they ran. But who had the motivation to run fastest and make sure he got away? The person who knew that this gun could be linked to him."

¶ 72   The ASA then stated that some witnesses in murder trials are "strangers who have no commitment, don't really know the victim, don't care, [and] don't want to step up." He continued:

"The other kind of people you have in murder trials are associates of the defendant. People who are loyal to the defendant. We [*sic*] don't want to testify either. *** In this case you learned that the day the gun was recovered there were three other people in that car. Navi Ray, Lonnie Hutcherson, and Andre Clifton *** The officer didn't see the fourth guy until they watched that video. They don't see the fourth guy slip out. What do we know happened. We know that after they realize there is a fourth guy they talk to those guys. And after they talk to those guys, the three of them they notify detectives from the north side of the City of Chicago."

¶ 73   Defense counsel objected and requested a sidebar. Defense counsel argued that the State was "going beyond just course of his investigation" and "commenting on content and substance of what the witnesses who did not testify said in their statements to the police." The trial court ruled that the State could not "comment about the conversations or anything like that okay. Just specifically what you did during the course of the evidence." The State then continued: "And then what do the detectives do? They put [defendant] into a photo array. There is an expression about word on the street. You know what they say about the word on the street. It's usually true." The trial court overruled defense counsel's objection and the ASA continued to argue:

"[Y]ou are aware that often law enforcement ask for anonymous tips, murders, serious violent crimes. Call in. There may even be an award for an anonymous tip. We will keep your identity secret.

So you got [*sic*] to ask yourself how valuable is that. Because an anonymous tip wouldn't get you into this courthouse. Anonymous tipsters can't testify. They are not of any evidentiary value.

What it is it's an investigatory tool. It helps police get the case started.

The next day after they put these photo arrays together they ask [Hall] to come in and look. And he immediately picks him out. The person who robbed him and shot [the victim].

\*\*\*

Mark Hall didn't want to be here. But his testimony was extremely reliable in 2014 when you think about it. He had a quick opportunity to make an identification. He had a great opportunity due to lighting conditions and distance. He made that identification. He identified this defendant. This gun turned out to be the murder weapon.

There is a reasonable inference to be drawn between that recovery and his placement in a photo array.

\* \* \*

Now it's 'I don't remember. I don't know. I don't care. The police told me what to do.' The law says you can take his statement from 2014 to the Grand Jury, his statement to the Assistant State's Attorney that was electronically recorded as if he gave it in here. And you know that that statement was reliable. It's borne out by this excellent

26

opportunity to identify and assess his appearance and to be able to recognize and identify him less than a week later and to be certain of his identification of this defendant."

¶ 74　　The jury found defendant guilty of the first degree murder of the victim and guilty of the armed robbery of the victim. In addition, the jury found that defendant personally discharged a firearm during the course of the murder.

¶ 75　　The defense filed a motion for a new trial on July 12, 2019. Defendant argued that the court erred by granting the State's motion to extend the speedy trial term where the State did not show the necessary due diligence. Defendant also argued that the court should not have admitted the substance of the "shots fired" 911 call, the dash-cam footage of the ensuing car chase, or that the conversations with Ray, Clifton, and Hutcherson led to police including defendant in the photo array.

¶ 76　　The motion also argued that the prosecutor erred by improperly using the substance of this evidence in closing, rather than only using it to explain the course of the investigation. Defense counsel challenged the State's arguments that defendant was the fourth person in the car, that the police looked for defendant after speaking with the three men in the car and put him in a photo array, and that the "word on the street" is "usually true." Counsel further challenged the discussion of anonymous tips. Defendant also asserted that the prosecutor erred by suggesting that Hall changed his testimony due to threats or other influence on the west side without evidence.

¶ 77　　The court heard arguments and denied the motion on September 5, 2019.

¶ 78　　At sentencing, the court merged the two counts of armed robbery and imposed consecutive sentences of 6 years for armed robbery, plus a 21-year firearm enhancement, and 30

years for first degree murder, with a 25-year enhancement for personally discharging the firearm, for a total 82-year term.

¶ 79        Defendant filed a motion to reconsider the sentence on September 26, 2019. At the hearing on the motion, the parties agreed that the maximum firearm enhancement for armed robbery was 15 years. The court then reduced the 21-year firearm enhancement for armed robbery to 15 years, resentencing defendant to a total 76-year term. Defendant filed a timely notice of appeal.

¶ 80        In this court, defendant contends that the trial court abused its discretion in granting an extension of the speedy trial term, that the trial court allowed "excessive and unnecessary 'course of investigation' evidence," and that the prosecution improperly argued the substance of such evidence in closing arguments as evidence of guilt. Finally, defendant contends that the prosecutor made additional improper remarks that were not based on the evidence during closing arguments—specifically, defendant challenges the prosecutor's remark that Hall's recantation was for "the benefit of the people *** out on the west side," implying that Hall recanted due to fear or threats, and the reference to "anonymous tips," which defendant contends "plant[ed] in the jurors' minds the notion that other people provided evidence of [defendant]'s guilt."

¶ 81        We first address defendant's speedy trial argument. "The right to a speedy trial is fundamental and guaranteed to a defendant under both the sixth amendment and the due process clause of the federal constitution [citations], and by article I, section 8, of our state constitution [citation]." *People v. Mayfield*, 2023 IL 128092, ¶ 18. The Illinois legislature conferred additional rights in section 103-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-5 (West 2018)), commonly known as the speedy-trial statute. In this case, defendant claims only a statutory violation of his speedy trial right under the Code.

¶ 82       The Code provides that every person taken into custody for an alleged offense shall be tried within 120 days of the date he or she was taken into custody, unless the defendant occasioned a delay. *Id.* § 103-5(a); *Mayfield*, 2023 IL 128092, ¶ 19. The 120-day period is tolled during any time when the defendant causes, contributes to, or otherwise agrees to a delay. *Mayfield*, 2023 IL 128092, ¶ 20. A trial court may, in its discretion, continue the case up to an additional 60 days if it finds that "the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day." 725 ILCS 5/103-5(c) (West 2018). Here, the defendant does not challenge whether the court appropriately determined that reasonable grounds existed to believe that such evidence may be obtained at a later date, arguing only that the trial court erred in finding due diligence.

¶ 83       " '[T]he test of due diligence is whether the State began efforts to locate its witness in sufficient time to secure [his or] her presence before the speedy trial term expired.' " *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 44 (quoting *People v. Exson*, 384 Ill. App. 3d 794, 799 (2008)). The State bears the burden of showing due diligence. *People v. Spears*, 395 Ill. App. 3d 889, 893 (2009); *People v. Battles*, 311 Ill. App. 3d 991, 997-98 (2000). Whether the State exercised due diligence is decided on a case-by-case basis, after a careful review of the specific circumstances of the case. *People v. Swanson*, 322 Ill. App. 3d 339, 342 (2001). A circuit court's ruling on due diligence will not be overturned unless it amounts to a clear abuse of discretion. *Id.* To determine whether a trial court properly exercised its discretion, a reviewing court shall " 'examine the entire record as it existed at the time the trial court considered the motion for continuance.' " *People v. Connors*, 2017 IL App (1st) 162440, ¶ 16 (quoting *People v. Terry*, 312 Ill. App. 3d 984, 990 (2000)). "A trial court abuses its discretion where its decision is arbitrary, fanciful, or

unreasonable, or where no reasonable person would take the court's view." *People v. Curry*, 2020 IL App (2d) 180148, ¶ 39.

¶ 84    In this case, defendant was arrested on May 30, 2014, and remained in custody throughout the proceedings. When a defendant remains in custody, the 120-day statutory period begins to run automatically from the date of arrest. *People v. Mayo*, 198 Ill. 2d 530, 536 (2002). Defendant was arraigned on July 11, 2014, at which point he was appointed counsel. Thereafter, defendant, through counsel, agreed to multiple continuances until the initial trial date, scheduled for July 23, 2018. At that point, the State answered "not ready," and defendant filed his speedy trial demand. The time from arrest to the first agreed continuance at arraignment used 42 days of the 120-day statutory term. See *People v. Ladd*, 185 Ill. 2d 602, 607-08 (1999) (computing the speedy trial term involves excluding the first day and including the last). Subsequently, defendant agreed to all continuances until July 23, 2018, and there remained 78 days in the speedy trial term as of the date defendant filed his speedy trial demand. See *Mayfield*, 2023 IL 128092, ¶ 20 ("A pretrial delay caused or contributed to by the defendant or otherwise agreed to by him is excluded from the computation of the 120-day period in which a trial must commence under section 103-5(a).").

¶ 85    As an initial matter, the parties dispute when the State's efforts to locate Hall started. Defendant contends that the search "did not even begin for more than a week after trial was supposed to start on July 23, 2018," pointing to the August 1, 2018, first entry on the investigator's reports. The State, however, contends that the record shows that it began its "efforts to locate Hall months prior to [the] July 23, 2018," initial trial date. In support, the State points to the prosecutor's statements to the court that the State had "been tracking Mr. Hall for a period of months." That statement, however, was made on October 3, 2018, at the hearing on the State's motion to extend

the speedy trial term, and it appears that the prosecutor was asserting that the State had been searching for Hall "for months" prior to the October 2018 hearing, and not the July 2018 initial trial date.

¶ 86     Nevertheless, even if the State's efforts began only on August 1, 2018, as the defendant contends, there were 69 days remaining in the speedy trial term at that point. This court has explained that "section 103-5(c) requires diligence in obtaining evidence within the 120-day term, rather than diligence in obtaining evidence before a scheduled trial date." *People v. Smith*, 268 Ill. App. 3d 1008, 1013-14 (1994) ("even assuming that the State acted less than diligently in securing [the two witnesses'] presence for the scheduled *** trial date, we cannot say that it acted less than diligently in securing their presence within the 120-day term").

¶ 87     This court finds *Smith* instructive. In *Smith*, 268 Ill. App. 3d at 1012-13, this court considered the defendant's argument that the trial court had abused its discretion in granting an extension of the trial term, arguing that the State failed to exercise due diligence in attempting to locate two witnesses where it did not begin to search for them until one week after the scheduled trial date. The record showed, however, that the State discovered that the two witnesses no longer resided at their last known residences after the initial trial date, but with 53 days before the expiration of the original 120-day term. *Id.* at 1014-15. Thereafter, the State "took substantial steps to locate them." *Id.* at 1014. Specifically, it "checked with the Illinois Department of Public Aid, the Illinois Secretary of State, and the United States Postal Service and it also checked arrest records. After approximately one month of searching, it located [one witness'] son in Plymouth, Indiana." *Id.* This court concluded, "Given these efforts, which were begun 53 days before the original 120-day term would have expired, we cannot say that the trial court abused its discretion in granting the State's motion for a continuance under section 103-5(c)." *Id.* This court also

observed that "nothing in the record indicate[d] that the State should have known that such searching for [the witnesses] would have been necessary." *Id.* Both witnesses had cooperated with the police and prosecution, and both witnesses resided in or near Chicago. "Given their earlier cooperation and that they both resided in or near Chicago, it was reasonable for the State to delay contacting them until the defendant's case clearly was in a trial posture." *Id.* Accordingly, the trial court found no abuse of discretion in the trial court's granting of a 60-day extension under the Act.

¶ 88        Similarly here, the record appears to indicate that the State did not begin its search for Hall until after the scheduled trial date. However, even more time remained in the speedy trial term—69 days—when the State began its efforts here, rather than the 53 days which remained in *Smith*. And we find that the efforts shown here were even more extensive than the ones found to be "substantial" in *Smith*. Here, the investigator's reports established that the investigator conducted research to identify various associates and residences associated with Hall, including following Hall on social media. The investigator contacted some of those associates and surveilled residences associated with Hall. In particular, the investigator went to one residence, where he spoke to the maternal grandmother of Hall's child, who then contacted the mother of Hall's child. The mother agreed to speak with the investigator, but then failed to make their planned call, and the investigator then contacted the maternal grandmother again. The record also showed that when Hall was arrested in Cicero, the address he gave was his father's residence, which had already been under surveillance, unsuccessfully, by the investigator. Finally, also like in *Smith*, Hall had previously cooperated in the investigation and resided in Chicago, making it reasonable for the State to have believed that securing his presence at trial would not have been difficult.

¶ 89        Defendant, however, contends that the investigator's reports show that he spent "a week waiting for a phone call here, a week waiting to be reappointed there" and that the State

"gave up with a week to go in the speedy trial term, preferring to wait for Hall to show up in court in Cicero rather than actively—diligently—search for him." Defendant asserts that *Battles*, 311 Ill. App. 3d at 998, instructs that this court should find no due diligence where the State failed to show that the delay was unavoidable.

¶ 90    We find *Battles* distinguishable from the case as bar. In *Battles*, the court considered, as a matter of first impression, "what it means to exercise due diligence in the DNA-testing context." *Battles*, 311 Ill. App. 3d at 997. The court noted that most cases up until that time related to "missing witnesses and the State's effort to find them," and determined that those cases were not "particularly helpful." *Id.* The court explained that the State did not decide to have DNA testing done until day 103 of the 120-day period, and then did not even attempt to conduct the testing in the remaining time available. *Id.* at 1004. The court found that the State could not use section 103-5(c) to "to cure the time problem created by its *lack* of effort. The State could not complete DNA testing within the 120-day speedy trial term because the State never attempted to test." (Emphasis in original.)

¶ 91    This case, however, does not concern DNA-testing, and we likewise find its analysis not "particularly helpful" here. And, unlike in *Battles*, where the State had not even decided to conduct DNA testing until 13 days left on the speedy trial term and it took no steps to do so within the term, the State here had at least 69 days remaining in the term when it began searching for Hall, and the record established extensive efforts to locate and serve Hall before the term expired.

¶ 92    Accordingly, we find the trial court did not abuse its discretion by granting an extension of the speedy-trial term.

¶ 93    Defendant's next arguments essentially challenge several pieces evidence that were admitted pursuant to the "course of investigation" hearsay exception. Defendant contends that the

evidence admitted was "excessive and unnecessary," that it introduced evidence of "other crimes," and that the prosecutor improperly relied on and argued that evidence substantively as proof of defendant's guilt. Defendant's challenges generally concern the admissibility of evidence, and we review the trial court's evidentiary rulings for an abuse of discretion. *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 39.

¶ 94    "A defendant is guaranteed the right to confront the witnesses against him by the confrontation clauses of both the United States and Illinois Constitutions." *People v. Jura*, 352 Ill. App. 3d 1080, 1084-85 (2004). "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted." *Id.* at 1085. "The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant." *Id.* "[U]nless it falls within an exception to the hearsay rule, this type of evidence is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant." (Internal quotation marks omitted.) *People v. Munoz*, 398 Ill. App. 3d 455, 479 (2010).

¶ 95    The "course of investigation" exception to the hearsay rule allows the admission of statements that explain the progress of a police investigation under the rationale that such evidence is not offered for its truth. *People v. Sample*, 326 Ill. App. 3d 914, 920 (2001). Such statements are "offered for the limited purpose of showing the course of a police investigation" (*Jura*, 352 Ill. App. 3d at 1085), and law enforcement officers "may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact" (*People v. Simms*, 143 Ill. 2d 154, 174 (1991)). A law enforcement officer may also testify about "conversations with others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the investigative steps taken by the officer." *Id.*;

*Jura*, 352 Ill. App. 3d at 1085. " '[O]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information.' " *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107 (quoting *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992)); *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 35 ("an officer may not testify to information beyond what is necessary to explain his or her actions").

¶ 96     Illinois courts have repeatedly held that the State may not use the limited investigatory procedure exception to place into evidence the *substance* of any out-of-court statement that the officer hears during his investigation, but may only elicit such evidence to establish the police investigative process. See *People v. Gacho*, 122 Ill. 2d 221, 248 (1988); *People v. Jones*, 153 Ill. 2d 155, 160 (1992); *People v. Hunley*, 313 Ill. App. 3d 16, 33-34 (2000); *Jura*, 352 Ill. App. 3d at 1085; *People v. Johnson*, 202 Ill. App. 3d 417, 421-22 (1990).

¶ 97     This court has recognized the importance of evidence explaining the course of police conduct, but also the danger of misuse of such statements. Specifically:

> "In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted 'upon information received,' or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great." *Boling*, 2014 IL App (4th) 120634, ¶ 108.

¶ 98    Moreover, it is improper for the prosecution to rely on such hearsay beyond the limited purpose of the exception in arguments to the jury. See *Jura*, 352 Ill. App. 3d at 1091 ("The error in repetition of the hearsay by the police witnesses was exacerbated by the State's use of the hearsay in opening statement and closing argument."); *People v. Singletary*, 273 Ill. App. 3d 1076, 1085 (1995) (prosecutor's remarks during opening statement and closing argument "went beyond what was necessary to explain investigatory procedures and were used to establish defendant's guilt").

¶ 99    Defendant specifically challenges several pieces of evidence that came in at trial, including that police were responding to a "shots fired" call a week after the offense, which led to a high-speed chase of a car in which the murder weapon was found, and that the three occupants implicated defendant in the murder and as the fourth occupant in the vehicle, tying him to the murder weapon. Defendant also challenges evidence that another robbery victim, Robinson, who was deceased at the time of trial, gave a videotaped statement, and the inference that the statement also implicated defendant.

¶ 100    At trial, Officer Kenar testified that on April 24, 2014, he and his partners received a "shots fired" dispatch, along with a description of the vehicle. They located the vehicle where they recovered what turned out to be the murder weapon and apprehended three passengers—Clifton, Ray, and Hutcherson. Detective Nanninga testified that she spoke to the three men at the station, and, thereafter, assembled a photo array, which included a photograph of defendant.

¶ 101    The above testimony would normally be entirely consistent with, and admissible under, the course of investigation exception to explain the police procedure. Although Officer Kenar's testimony included a statement from a nontestifying witness—the "shots fired" call—it was admissible, not for the truth of the matter, but to show how police recovered the murder weapon

36

and ultimately included defendant in a photo array. See *Jura*, 352 Ill. App. 3d at 1085. And Detective Nanninga's testimony did not include any information as to the content of Clifton, Ray, and Hutcherson's statements. She expressed only that that she spoke to the three men and, thereafter, included defendant's photo in a photo array shown to Hall. The problem arose in this case, however, because the State then used that testimony beyond its intended purpose—to show that defendant was the fourth passenger in the vehicle, that he possessed the murder weapon, and that the other passengers had implicated him in the charged offense.

¶ 102      Initially, we note that there was no evidence introduced at trial that defendant was present in the car during the April 24, 2014, high-speed car chase that resulted from the "shots fired" call or that tied him to the firearm found in the vehicle. The State acknowledges the lack of evidence, but contends that these are "reasonable and logical *inferences* from the trial testimony." (Emphasis in original.) Such inferences, however, are improper as they could only arise from trial testimony that was admitted for the limited purpose of explaining the police's course of investigation. The evidence was not admitted to suggest the substance of the three men's statements, and the only way such evidence could come in substantively is if Clifton or Ray had been called to testify.[3] The State, however, attempted to use the trial testimony that police spoke to Clifton, Ray, and Hutcherson and then began searching for defendant, to create the inference that the three men had informed police that defendant was present in the vehicle during the chase, that he possessed the firearm, and that he was involved in the offense. This goes beyond the parameters of the investigatory procedure exception. See, *e.g.*, *Boling*, 2014 IL App (4th) 120634, ¶ 107 (" '[O]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary

---

[3]The record indicates that Hutcherson died before trial.

and prejudicial information.' " (quoting *O'Toole*, 226 Ill. App. 3d at 988)); *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 35.

¶ 103    Indeed, the prosecutor made this very argument in closing, specifically telling the jury: "There were four people in the car and I submit to you the fourth person *** was the defendant. *** The three that got caught they ran. But who had the motivation to run fastest and make sure he got away? The person who knew that this gun could be linked to him."

¶ 104    The defense objected, and the trial court overruled the objection, finding that it was "argument" and the jury "has heard the evidence. They will only consider the evidence and the reasonable inferences to be drawn from it."

¶ 105    The prosecutor also improperly implied the substance of statements to police by Ray, Hutcherson, and Clifton by arguing in closing that there was "a reasonable inference to be drawn between that recovery [of the murder weapon] and [defendant]'s placement in a photo array." The prosecutor further asserted that the three men did not testify because they were "associates of" and "loyal to defendant," but "[y]ou know what they say about the word on the street. It's usually true." In so arguing, the prosecutor asked the jury to infer that the men had identified defendant as being involved in the offense and present in the vehicle where the murder weapon was found and that those out-of-court statements—"the word on the street"—was true.

¶ 106    By arguing in this manner, the State disregarded the limited purpose for which the evidence had been admitted, using the evidence substantively to establish defendant's guilt rather than to explain the officers' investigatory procedure. See *Jura*, 352 Ill. App. 3d at 1091; *Singletary*, 273 Ill. App. 3d at 1085 (prosecutor's comments during opening and closing statements "went beyond what was necessary to explain investigatory procedures and were used to establish

38

defendant's guilt rather than explain police conduct"); *People v. Williams*, 289 Ill. App. 3d 24, 34 (1997) (finding that the prosecutor's remarks were "an example of the *** recognized practice of prosecutors taking improper advantage of the admissibility of testimony by a police officer to explain his investigatory procedure, only to use that testimony, once it is admitted, to impermissibly use it in closing argument" (internal quotation marks omitted)).

¶ 107    In so holding, we find this case analogous to *Jura*, 352 Ill. App. 3d 1080, *Singletary*, 273 Ill. App. 3d 1076, and *People v. Shorty*, 408 Ill. App. 3d 504 (2011). In these cases, the court found that the evidence admitted, and the arguments made by the prosecution, went beyond the course of investigation exception.

¶ 108    In *Jura*, the defendant appealed his conviction for unlawful use of a weapon by a felon. At trial, three police officers testified that they responded to a radio call of a " 'person with a gun' " in an alley. *Jura*, 352 Ill. App. 3d at 1082-83. The radio call also described the suspect as a "male White" and included information about height and a face tattoo. *Id.* After receiving the radio call, the officers went to the alley, saw the defendant discard a gun in a garbage can, and arrested him for possession of a gun. *Id.* at 1082. On appeal, the court acknowledged that officers may testify to statements made out of court where the statements are used to show the officers' investigative steps and not for the truth of the matter asserted but cautioned that the statements must be "necessary and important to fully explain the State's case." (Internal quotation marks omitted.) *Id.* at 1085. The appellate court determined that the officers' testimony went beyond what was necessary to explain their investigatory procedures. *Id.* at 1086. The court rejected the State's argument that the testimony was admissible as course of investigation evidence because "[t]here was no issue regarding the reason why the officers proceeded to the alley." *Id.* The State "merely needed to demonstrate that the officer was on duty, received a radio call, and as a result of that call

proceeded to the alley." *Id.* The court also explained that the State improperly "relied on the substance of these statements in both opening statement and closing argument to prove that defendant matched the hearsay description of the man with a gun." *Id.* at 1088. Accordingly, the court concluded that the evidence was not used merely to explain the police investigation, but rather "as substantive evidence to prove defendant guilty." *Id.* at 1089.

¶ 109     Next, in *Singletary*, the defendant was found guilty of possession with intent to deliver a controlled substance. *Singletary*, 273 Ill. App. 3d at 1078. At trial, a police officer testified that he had received a tip from a confidential informant that the defendant was planning to pick up a package of cocaine. *Id.* Specifically, the officer testified that the informant provided him with the defendant's first name, " 'a brief description of [the defendant], type of auto that he would be riding in, and that he was going to go to [the address] and pick up a package of cocaine.' " *Id.* at 1082. Police surveilled the address and witnessed the defendant arrive as a passenger in a vehicle, exit the vehicle, go into the building, and return minutes later. *Id.* at 1079. Police then stopped the vehicle after it left the location, and a drug dog alerted officers to narcotics under the seat in which the defendant was riding. *Id.* During closing argument, the prosecutor reiterated to the jury that an informant told the officer that a person with the defendant's name and physical description would be arriving at a specific address at a particular time in a particular type of automobile to pick up a package of cocaine. *Id.* at 1085.

¶ 110     On appeal, the defendant argued that he was deprived of his constitutional right to confront witnesses against him where hearsay statements of the informant were admitted as evidence against him. *Id.* at 1078. The appellate court initially discussed the history and theory regarding the admission of out-of-court statements to explain a course of police conduct "and the danger of misuse of such statements." *Id.* at 1082-83. The court noted that where officers testify

to information beyond what is necessary to explain police conduct, " 'these references would likely be understood by the jury as pertaining to necessary elements of the crime for which defendant was being tried.' " *Id.* at 1082 (quoting *People v. Cameron*, 189 Ill. App. 3d 998, 1005 (1989)).

¶ 111    In reversing the defendant's conviction, this court concluded that the officer's testimony regarding his conversation with the informant "went beyond what was necessary to explain the officer's conduct and presented the substance of his conversation with the informant" and that the prosecutor's remarks in closing "also went beyond what was necessary to explain investigatory procedures and were used to establish defendant's guilt rather than explain police conduct." *Id.* at 1084-85.

¶ 112    Finally, in *Shorty*, 408 Ill. App. 3d at 504-05, the defendant was convicted by a jury of unlawful possession and possession with intent to deliver heroin. In opening statements, the prosecutor informed the jury that they would hear testimony from a police officer that a confidential informant told him that the defendant was going to be going to Chicago later that evening to buy heroin and that he would be going in a certain vehicle. *Id.* at 505. Then, at trial, a police officer testified that he " 'received information from an individual that [the] defendant was supposed to be making a trip to Chicago that evening to pick up a large quantity of heroin.' " *Id.* at 506. The informant told the officer that the defendant was at a particular hotel and the type of vehicle that would be used. The informant later told the officer that the defendant "did 'in fact have the heroin' " and that he would be returning to the hotel in the previously described vehicle. *Id.* During this testimony, the trial court instructed the jury that " 'the information the officer is testifying to that he received is allowed for the purpose of explaining the actions of the officer and not for the truth of the matter that might have been told to the officer, but to explain the officer's actions then." *Id.* The officer then went on to testify that he set up surveillance at the hotel and

witnessed the described vehicle. The officer testified that defendant was arrested thereafter and identified the informant as another passenger in the vehicle. *Id.*

¶ 113    On appeal, the defendant claimed that it was reversible error to allow the prosecutor to inform the jury that the police received information indicating that the defendant planned a trip to Chicago to buy heroin and that the error was compounded by the officer's later testimony. *Id.* at 507.

¶ 114    The Third District Appellate Court noted that the alleged improper statements went "directly to the matter in controversy: whether [the] defendant possessed the heroin found in the vehicle." *Id.* at 510. And while the prosecutor improperly relied on the substance of the hearsay testimony, the State had not called the informant to testify. The court explained:

> "It strains our credulity to accept that this was anything more than a prosecutor's successful attempt to put on the not-so-confidential informant's testimony as to defendant's guilt without subjecting the witness to cross-examination and impeachment. *** One would not have to be a cynic to conclude that the State did not call the witness because it did not want the witness exposed to cross-examination." *Id.*

¶ 115    Additionally, the court noted that the testimony elicited from the officer was not necessary to establish the police procedure. The court posited that the prosecution

> "could have elicited testimony from [the officer] that explained his investigatory procedures without disclosing the substance of the conversations had between the officer and the informant and without hearsay as to defendant's guilt. By way of explanation, the prosecutor could have simply elicited testimony from the officer that a confidential informant (CI) provided information that at the time and place in question, [the vehicle] would appear with three occupants and the vehicle would

42

contain drugs. This would explain why the officers were at the \*\*\* hotel and why they stopped defendant's vehicle. There was no need to go beyond that if the only goal was to explain police conduct." *Id.*

¶ 116 The court further found that the "trial court's limiting instruction to the jury did not cure the error," explaining that " '[h]earsay testimony identifying the defendant as the one who committed the crime cannot be explained away as "police procedure," even where the trial judge limits the evidence to a nonhearsay purpose.' " *Id.* at 511 (quoting *People v. Rivera*, 277 Ill. App. 3d 811, 820 (1996)).

¶ 117 Like in *Jura*, *Singletary*, and *Shorty*, the prosecutor in this case used the challenged evidence as substantive evidence of defendant's guilt, and that evidence went directly to the matter in controversy. In closing, the prosecutor suggested that the jury could infer that defendant was present during the April 24, 2014, car chase, that he possessed the murder weapon, and that he ran from the vehicle because he "knew that this gun could be linked to him." These remarks—like those at issue in *Jura*, *Singletary*, and *Shorty*—went well beyond what was necessary to explain the investigatory actions leading to defendant's arrest and, instead, suggested that the hearsay statements were substantive evidence of defendant's guilt of the charges for which he was on trial.

¶ 118 Defendant also challenges the admission of the "shots fired" call and the dash-cam video of the high-speed chase. Defendant notes that Officer Kenar was permitted to testify that he received a dispatch of "shots fired," got a description of a car, found the car, and activated his squad car lights. The car did not pull over but ran through a red light and stop sign, drove into oncoming traffic, and eventually crashed. A dash-cam video recording of the chase was played for the jury, which, as the prosecutor described, shows the car "doing figure 8s, driving over medians, \*\*\* [and] c[r]ash[ing] into a school sign" before the occupants fled the vehicle.

¶ 119    The State responds that the "shots fired" call and the dash-cam video were "relevant as course of investigation evidence that explained the officers' conduct and how defendant came to be arrested." The State further asserts that "[w]ithout this evidence, the jurors would have been left to wonder why officers engaged in a high-speed chase with the Dodge, arrested its occupants, and searched it after only seeing the driver commit a traffic violation." Defendant, however, contends that the evidence was irrelevant, that any limited relevance was outweighed by its prejudicial effect (Ill. R. Evid. 403 (eff. Jan 1. 2011)), and that the introduction unnecessarily injected "other crimes" evidence into the trial.

¶ 120    Evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's disposition or propensity to commit crime. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). However, evidence of the commission of other crimes committed by the defendant is admissible when such evidence is relevant to establish any material question other than the defendant's propensity to commit a crime. *Thingvold*, 145 Ill. 2d at 452. When evidence of other crimes is offered, the trial judge must weigh its probative value against its prejudicial effect and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 365. "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). "[E]vidence of other crimes is not admissible merely to show how the investigation unfolded *unless* such evidence is also relevant to specifically connect the defendant with the crimes for which he is being tried." (Emphasis in original.) *People v. Lewis*, 165 Ill. 2d 305, 346 (1995). "The limitation applies to prevent the risk of prejudice to a defendant even in the face of the State's legitimate need to present evidence of the steps in its investigation." *Id.* at 347.

¶ 121    In the circumstances here, we conclude that the evidence showing that police were responding to a "shots fired" call was admissible to explain how the police became involved in the traffic stop from which the murder weapon was recovered. As set forth above, a police officer "should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct." (Internal quotation marks omitted.) *Boling*, 2014 IL App (4th) 120634, ¶ 108.

¶ 122    Although that testimony was admissible as course of investigation evidence, the court did not issue a limiting instruction when the evidence was presented. When investigative procedure evidence is admitted at trial, the court "must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act and that [the jurors] were not to accept the statement as true." *People v. Trotter*, 254 Ill. App. 3d 514, 527 (1993). Absent a limiting instruction, it cannot be presumed that the jury's use of hearsay evidence was limited to a non-hearsay purpose. *Id.* at 527-28; *Jura*, 352 Ill. App. 3d at 1093.

¶ 123    In this case, at the pretrial hearing on the defense's motion *in limine*, the court said that it would issue a limiting instruction informing the jury that the "shots fired" call could only be considered to explain the chase. In so holding, the court recognized the risk that such evidence could be "unduly prejudicial," but determined that issuing a limiting instruction would mitigate that risk. At trial, however, the court did not issue a limiting instruction, and the State then invited the jury to make improper inferences from the entry of that evidence, including that defendant was present in the vehicle and that he possessed the murder weapon. That was error.

¶ 124    Although we find that the "shots fired" call would have been admissible—had the court given the intended limiting instruction—the dash-cam video of the high-speed chase was not likewise "necessary and important" to explain the course of investigation. While the State is

permitted to explain to the jury how the murder weapon was recovered and how defendant came to be involved in the investigation, it did not need to display a dash-cam video of an intense car chase to do so. Instead, the State could have adequately explained the investigation by establishing that police received a call of "shots fired" and effectuated a traffic stop in response. Police then detained three occupants, while a fourth occupant fled, and recovered a firearm from the vehicle. Police spoke to those occupants and, thereafter put defendant's photograph into the photo array shown to Hall.

¶ 125    We reiterate, however, that by concluding that the testimony that police were responding to a "shots fired" call was admissible as course of investigation evidence, we are not countenancing the State's use of that evidence to suggest that defendant was involved in the car chase, that he possessed the murder weapon, or that he fled from the vehicle due to his consciousness of guilt. By introducing evidence that police were responding to a report of a shooting, presenting a video of the resulting high-speed chase and insinuating—and later explicitly arguing—that defendant participated in that chase, the State improperly suggested that defendant was involved in crimes other than the one for which he was on trial. Without introducing testimony from a witness that defendant was present on April 24, 2014, the State cannot suggest to the jury that defendant was the fourth passenger or that he possessed the weapon. See *Boling*, 2014 IL App (4th) 120634, ¶ 107 ("Testimony about the steps of an investigation may not include the *substance* of a conversation with a nontestifying witness." (Emphasis in original.)).

¶ 126    Finally, defendant asserts that the trial court erroneously admitted testimony under the "course of investigation" exception that Terrell Robinson had also provided a videotaped statement, which led to the police searching for defendant. We agree.

¶ 127    The record shows that the State introduced evidence that Hall identified defendant as the shooter to the police in a photo array on April 25, 2014, and in a videotaped statement on April 26, 2014. Detective Kennedy testified about Hall's identifications as well. The State was then allowed to further elicit from Detective Kennedy, over the defense's objection, that he also obtained a videotaped statement from Terrell Robinson on April 26, 2014, and then issued an investigative alert, which meant that they were "looking for" defendant. ASA Waller also testified that he met with both Hall and Robinson on the night of April 26, 2014, that he took a videotaped statement from Hall, and that he then took a second videotaped statement. When asked whose statement, the court then sustained the defense objection.

¶ 128    Once the State elicited evidence that Hall identified defendant, the State did not need to provide further information to explain why the police sought to arrest defendant. See *Simms*, 143 Ill. 2d at 174 ("a police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact"). In these circumstances, Robinson's statement had no probative value to explain the police procedure; instead, it is apparent that the evidence was introduced to suggest that Robinson, who was deceased at the time of trial, also identified defendant, corroborating Hall's identification.

¶ 129    The conclusion that all of evidence we have discussed above was improperly admitted, and that the prosecutor improperly relied on that evidence during closing argument, does not end our inquiry. Inadmissible hearsay does not require reversal where the record clearly shows that the error was harmless—*i.e.*, where there is no reasonable probability the jury would have found the defendant not guilty had the hearsay been excluded. *Jura*, 352 Ill. App. 3d at 1089; see *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37. And, in the context of a prosecutor's arguments, a reviewing

47

court will find reversible error "if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *People v. Jackson*, 2020 IL 124112, ¶ 83. "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 130    When deciding if an error is harmless beyond a reasonable doubt, courts may "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 131    Although Hall's prior identification of defendant was sufficient to support his conviction, we do not find the evidence presented below to be overwhelming. Hall was the only witness to identify defendant as the perpetrator, and he recanted that identification at trial. And the improperly entered evidence was not merely cumulative of properly admitted evidence. As discussed above, there was no evidence properly admitted at trial that linked defendant to the April 24, 2014, car chase or to the murder weapon that was found in that vehicle. Despite the lack of evidence, the jury was invited to infer that defendant engaged in crimes other than those charged, that he was present during the car chase, that he possessed the murder weapon, and that he fled from the vehicle due to his consciousness of guilt. In the circumstances here, we find the errors so serious that there is a reasonable probability that, had the improper evidence and argument been excluded, the jury could have found defendant not guilty. See *id.* (error is not harmless where it

"might have contributed to the conviction"). Accordingly, defendant's convictions must be reversed.

¶ 132    Although we have concluded that the case must be reversed for the reasons set forth above, we will continue to address defendant's remaining challenges to the prosecutor's closing arguments, as these issues may be relevant in a future retrial.

¶ 133    Defendant first challenges the prosecutor's argument that Hall's recantation was "for the benefit of the people *** out on the west side" to show that Hall "isn't an informant. That he is not a snitch. That he is not weak." Defendant asserts that such argument was improper as it suggested, without any evidentiary basis, that Hall's recantation was due to fear or threats.

¶ 134    A prosecutor may argue facts and legitimate inferences drawn from the evidence. (*People v. Turner*, 128 Ill. 2d 540, 560 (1989)), but it is improper for the prosecutor to argue assumptions or facts not based upon the evidence in the record (*People v. Johnson*, 208 Ill. 2d 53, 115 (2003)). It is also improper for the prosecutor to do or say anything in argument "the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision." *People v. Smith*, 141 Ill. 2d 40, 60 (1990). Specifically, a prosecutor may not "suggest that a witness was afraid to testify because the defendant threatened or intimidated him when that argument is not based on evidence produced at trial." *People v. Cox*, 377 Ill. App. 3d 690, 707 (2007); *People v. Mullen*, 141 Ill. 2d 394, 405 (1990) ("[p]rosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any evidence in the record *** are highly prejudicial and inflammatory" (internal quotation marks omitted)).

¶ 135    In support of defendant's claim that the above comments were improper, defendant relies on *Rivera*, 277 Ill. App. 3d at 821, and *People v. Brown*, 113 Ill. App. 3d 625 (1983), which

both concerned a prosecutor's closing arguments that either explicitly stated or clearly implied that a witness feared retaliation *by the defendant or his associates*, without any evidentiary support. Here, however, the prosecutor's more generalized statements did not attribute Hall's fear to any intimidation by, or fear of, defendant or his associates. And the prosecutor's comments were based on the evidence showing that Hall still lived in the area where the offense occurred and that he was reluctant to testify in this case—Hall testified that he did not want to be testifying in court, that he did not comply after being served with a subpoena, and that he was currently on house arrest for his failure to do so. Because the State's comments were supported by evidence in the record and did not link his fear to any threats or intimidation by defendant, we find no error based on this argument.

¶ 136    Finally, defendant contends that the following remarks by the prosecutor in closing were improper:

> "When you have in your own life experience you are aware that often law enforcement ask [*sic*] for anonymous tips, murders, serious violent crimes. Call in. There may even be an award for an anonymous tip. We will keep your identity secret.
>
> So you got [*sic*] to ask yourself how valuable is that. Because an anonymous tip wouldn't get you into this courthouse. Anonymous tipsters can't testify. They are not of any evidentiary value.
>
> What it is it's an investigatory tool. It helps police get the case started."

¶ 137    Defendant asserts that the prosecutor's "strange references" to anonymous tips were not based on any evidence introduced at trial, and they "did nothing but plant in the jurors' minds the notion that other people provided evidence of [defendant]'s guilt that 'help[ed] the police get the case started.' " The State responds that the prosecutor's comments did not suggest that the

police actually received any anonymous tips, but "instead argue[d] the inference that Det[ective] Nanninga included defendant in the photo array based on information she gleaned during her conversations with Ray, Hutcherson and Clifton." It is unclear to this court, however, how the remarks at issue could be referencing Ray, Hutcherson, and Clifton, as their identities were known to police and the jury, and their conversations with police could not be characterized as "anonymous tips."

¶ 138    Defendant cites *People v. Shief*, 312 Ill. App. 3d 673 (2000), to support his argument that the prosecutor's comments in this case were improper. In *Shief*, the prosecutor told the jury,

> " 'Let's talk about police reports. Guess how many police reports you're going to get with you when you go back to that jury room?
>
> * * *
>
> You're not getting any. You know why[?]
>
> * * *
>
> They're not evidence. You see if I had my way, I would hand you all these police reports and say you go back in there and say he's guilty[.]' " *Id.* at 677-78.

¶ 139    The court in *Shief* found that the above statements erroneously suggested that there were arrest reports that would have established the defendant's guilt, explaining that "[a] prosecutor exceeds the bounds of permissible argument where he comments on facts that are inadmissible or where he suggests that evidence of guilt existed but that, because of its inadmissibility, cannot be heard by the jury." *Id.* at 679; see *People v. Ray*, 126 Ill. App. 3d 656, 661-62 (1984) (finding prosecutor committed error where he told the jury in closing that " 'I wish I could give you my file as you sit there to go back in there, but I'm not allowed to because that is

the law' " because the comments suggested the prosecutor was referring to evidence that was unpresented).

¶ 140　　We agree with defendant that the prosecutor's comments in this case were similar to the improper comments made in *Shief.* Here, the prosecutor referenced the existence of anonymous sources who give "tips," but who could not testify, because such evidence is not admissible. This argument improperly insinuated that additional inculpatory evidence existed that the jury did not hear due to evidentiary rules.

¶ 141　　In closing, because we have determined that a new trial is necessary, we provide the following directions to guide that retrial. If the court grants a request to use course of investigation evidence, a limiting instruction should be given and the evidence should be introduced as set forth above, so as to not suggest the content of conversations or introduce unnecessary and prejudicial information. The limiting instruction should explain that the evidence showing a "shots fired" call is being introduced solely to explain the course of investigation and should not be considered for any purpose other than how the investigation progressed. If, as in the previous trial, the State does not introduce substantive evidence through the testimony of Clifton or Ray regarding the circumstances of their presence in the vehicle, the dash-cam video should not be introduced and the prosecutor may not invite the jury to conclude that defendant was a passenger in the vehicle, that he possessed the gun, or that he fled. Finally, the prosecutor must refrain from suggesting that any course of investigation evidence may be considered as substantive evidence of guilt or that there exists additional evidence that was not heard by the jury.

¶ 142　　For the foregoing reasons, we reverse defendant's convictions and remand for a new trial.

¶ 143　　Reversed and remanded.

*People v. Williams*, 2023 IL App (1st) 192463

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-11565(01); the Hon. Lawrence E. Flood, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph Alexander, Brian K. Hodes, and Susan Wobbekind, Assistant State's Attorneys, of counsel), for the People. |