2024 IL App (1st) 220170-U

No. 1-22-0170

Filed May 16, 2024

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 1013 |
| | ) | |
| RONALD WILLIAMSON, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1      *Held*:  Admission of prior consistent statements was harmless. Counsel's failure to object to introduction of a witness's grand jury testimony was not ineffective assistance. Defendant was tried within 120 days, excluding delays attributable to him and the Illinois Supreme Court's COVID-19 emergency orders.

¶ 2      Following a jury trial, Ronald Williamson was convicted of first degree murder and sentenced to a prison term of 24 years. The State charged Williamson under a theory of felony murder. It alleged that Williamson was committing home invasion when his accomplice, Lawrence Pitts, was shot and killed by an occupant. Williamson appeals his conviction arguing that (1) the trial court improperly admitted prior consistent statements from several witnesses, (2) trial counsel

was ineffective for failing to object to the admission of a witness's grand jury testimony, and (3) he was deprived of his right to a speedy trial. We affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Demands for Trial

¶ 5      Williamson was arrested on December 16, 2015, and remained in custody thereafter. Following his felony arraignment in January 2016, he agreed to numerous continuances before demanding trial in September 2020. Earlier that year, the Illinois Supreme Court ordered that the Chief Judges of each circuit court were permitted to continue trials until further order of the supreme court due to the state of emergency declared by the Governor related to the COVID-19 virus. Ill. S. Ct., M.R. 30370 (eff. Apr. 3, 2020). The order specified that any delays resulting from such continuances would be excluded from calculations under the speedy trial statute (725 ILCS 5/103-5 (West 2018)). In accordance with the supreme court's emergency order, Timothy Evans, the Chief Judge of the Cook County Circuit Court, issued orders continuing all matters through May 31, 2020.

¶ 6      In May 2020, the supreme court modified its order to permit circuit courts to resume hearing matters, either remotely or in person, according to a schedule adopted by the Chief Judge of each circuit. The order maintained that continuances in criminal cases were excluded from speedy trial computation. Ill. S. Ct., M.R. 30370 (eff. May 20, 2020). Following this amendment, Chief Judge Evans ordered the Cook County Circuit Court to resume hearing all matters except jury trials. His order reiterated that delays resulting from his order did not count toward the statutory speedy trial period.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7        In response to Williamson's September 2020 trial demand, the court set the case for a status hearing in November 2020 and ascribed the continuance to the State. In so doing, however, the court indicated it would not include any delay attributable to the supreme court's and Chief Judge Evans's emergency orders in its speedy trial calculation. Williamson renewed his trial demand in November. The case was continued again, with the court citing the emergency orders. Williamson agreed to continuances in January and March 2021.

¶ 8        In March 2021, Chief Judge Evans modified his order to allow jury trials to resume at the Leighton Criminal Courthouse, where Williamson's case was pending. Williamson made another trial demand on April 30, 2021. The court continued the case to June 2021. As before, the court stated that the continuance would not affect the speedy trial calculation. This repeated in August 2021.

¶ 9        The supreme court modified its order again in June 2021. The amended order stated that the speedy trial statute would no longer be tolled beginning October 1, 2021. Ill. S. Ct., M.R. 30370 (eff. June 30, 2021). The order further provided that any days prior to March 20, 2020, and days beginning on and after October 1, 2021, must be included in speedy trial computations.

¶ 10       Williamson filed a motion to dismiss based on speedy trial grounds on October 1, 2021. The court denied the motion and Williamson's trial commenced on October 4, 2021.

¶ 11                                            B. Trial

¶ 12       Seven witnesses testified that they were present in a house located at 2223 South Avers Avenue in Chicago on December 15, 2016. Each witness gave a largely consistent account. Christopher Lewis lived on the first floor of the three-flat building. He shared the apartment with several family members, including his cousin, Nina Shotwell; her husband, Jerome McClain; Nina

and Jerome's three minor children; and Jerome's brother, Marcus McClain.[2] At the time, Christopher sold marijuana for a living. He testified that he did not keep marijuana in the house or conduct drug transactions there. A backpack filled with 320 baggies containing marijuana, a scale, and $870 in cash were later recovered from the house, though.

¶ 13    On the evening of December 16, 2015, Christopher, along with his brother Damont Lewis, cousin Derrick White, and friend Ryan Scott, were watching the Chicago Bulls basketball game in the rear of the apartment near the kitchen area. Nina and Jerome's three children were in the front room watching television, while Nina and Marcus were in their respective bedrooms.

¶ 14    Three of the men watching the Bulls game—Christopher, Ryan, and Damont—testified that they heard a knock at the back door. Christopher testified that, when he answered, an armed man he identified as Williamson stuck his arm through the door and tried to "rush in." Christopher grabbed Williamson's wrist and pushed against the door to prevent him from entering. Ryan and Damont corroborated that they observed Christopher pushing the door against a handgun-wielding arm. Marcus and Andrew—one of the children in the front room—testified to observing this as well. Marcus and Andrew were impeached with prior statements they gave when interviewed by police shortly after the incident that omitted this detail. Marcus testified on redirect examination that he told the grand jury that he observed Christopher pushing against an armed intruder. Derrick's account differed in that he did not recall hearing a knock or observing Christopher struggle with an intruder at the door. However, he explained that his attention was on his cell phone, and he quickly exited the house upon hearing "rumbling" and someone say "gun!" Similarly, Nina did not observe Williamson's entry, as she was in her bedroom.

---

[2]For clarity, we refer to State witnesses by their first names after introduction.

¶ 15        Williamson managed to overcome Christopher's resistance and forced his way into the house. He demanded Christopher's "stuff" and money. Derrick, Damont, and Ryan fled through the front door, while Christopher and Marcus struggled with Williamson in the front room. Christopher picked up a television to use as a weapon but set it down, concerned that he might endanger the children. Meanwhile, Marcus grabbed Williamson from behind and placed him in a choke hold, as the two fell to the floor. Marcus managed to dislodge some bullets and the magazine from Williamson's semiautomatic handgun. Williamson yelled for "Cool" to help him. A heavyset man, later identified as Pitts, entered through the back door while holding a handgun, and wearing a mask covering the top half of his face. Williamson implored Pitts to shoot Marcus and get Marcus off him. Pitts waved his gun at Christopher and Marcus, saying "give me your stuff." When Nina went to check on the noise, Pitts pointed a gun at her. Nina led the children outside as Marcus and Christopher struggled with the intruders.

¶ 16        Christopher then relented and agreed to give the intruders what they wanted. Pitts grabbed Christopher by the collar and dragged him toward the rear of the apartment. As they approached the kitchen, Christopher tried to grab Pitts's gun. The two struggled. Christopher twisted Pitts's arm. Pitts then punched Christopher and flung him onto a table. The gun fell from Pitts's hand and Christopher picked it up. Christopher covered his face with his free hand and fired two shots. Christopher then ran out the back door and stashed the gun in an abandoned car in the alley. At trial, Christopher explained that he stashed the gun because he was nervous and did not know what to do.

¶ 17        Marcus managed to obtain Williamson's handgun and began striking him with it until he believed Williamson was unconscious. Marcus then heard a gunshot from the kitchen and ran out the front door, while still in possession of Williamson's gun. Once outside, he noticed Williamson

in the backyard staggering toward the alley. Marcus went through the gangway and hit Williamson with the gun again. He held Williamson on the ground until police officers arrived.

¶ 18   Police arrived at the home in response to a report of a person with a gun. Marcus was found hitting Williamson in the backyard. He ceased when commanded and dropped the handgun. Pitts was found lying on the back porch. A black skull cap was pulled over his nose. Both Pitts and Williamson were transported to a hospital. No cash was found among their possessions.

¶ 19   Police found live rounds of ammunition in the front room. A semi-automatic handgun covered in blood was found in the backyard, with the magazine "not seated properly." A skull cap and brown leather jacket were found on the rear porch. Nothing was in the jacket pockets.

¶ 20   Christopher led police to the abandoned car, where they recovered the handgun he hid after shooting Pitts.

¶ 21   The parties stipulated that the medical examiner would testify that Pitts sustained two gunshot wounds, one to his head and the other to his abdomen. His death was determined to be a homicide caused by multiple gunshot wounds.

¶ 22   Williamson chose to testify in his own defense. He recounted that he was "just following" Pitts, his lifelong friend, to a house on the 2200 block of South Avers Avenue to "buy some weed" and he had lent Pitts $20 for the purchase. Pitts knocked on the back door and someone inside asked who was there. Pitts responded, "Larry" or "Big Larry," and asked the person who answered whether they were "working." A man Williamson later learned to be Christopher opened the door and told them to come in. Williamson denied that either he or Pitts pounded on or kicked the door or that he had ever been to that house before.

¶ 23   After he and Pitts entered the kitchen area in the rear of the house, Marcus came down the hall yelling "Where's my s***? Give me my s***!" toward Pitts. Pitts responded, "I don't owe

you s*** and I ain't got s***." Marcus and Pitts continued to argue and began fighting. Christopher then started fighting with Williamson. Williamson fought back and was struck from behind by Marcus. He fought with Marcus, and they moved from the kitchen to the front of the house. Marcus was "getting the best of" Williamson and slammed him down. Marcus continued to punch Williamson until he lost consciousness. Williamson believed Marcus hit him with his fists at first but then began hitting him with a metal object. When he regained consciousness, Williamson made his way to the back door and found a bloodied and unmoving Pitts lying on the back porch. Williamson fell down the stairs. He returned to his feet and walked down a gangway until someone came from behind and started beating him. Eventually, Williamson was taken by ambulance to Mt. Sinai Hospital. Williamson denied that he or Pitts possessed handguns or any weapons when they went to the house on Avers Avenue.

¶ 24     On cross-examination, Williamson said he did not know Pitts to be called "Cool," only "Larry" or "Big Larry." He clarified that Pitts entered the house first and that Christopher and Marcus were the only people he observed in the house. He claimed that he did not see any of the other State witnesses who testified that they were present when this incident occurred. When asked why he did not leave after Marcus began yelling, Williamson explained, "I didn't want to leave my friend there," but, in retrospect, he wished he had left.

¶ 25     During the jury's deliberation, it sent the court a note that read: "We cannot come to an agreement. Not every person feels there is enough evidence to convict. What do we do next?" The parties agreed that the jury should be instructed to continue deliberating. The court returned the note with the response "Please continue to deliberate."

¶ 26 The jury ultimately found Williamson guilty of first degree murder and two counts of home invasion. The court merged the home invasion counts into the murder conviction and sentenced Williamson to 24 years in prison. This appeal followed.

¶ 27                                     II. ANALYSIS

¶ 28                            A. Prior Consistent Statements

¶ 29 Williamson first argues that the trial court erred by allowing the State to elicit evidence of prior consistent statements from multiple witnesses. Specifically, Williamson challenges the affirmative responses the State elicited from five witnesses that suggested the witness gave a prior statement consistent with their trial testimony. First, Christopher gave affirmative responses to the prosecutor asking whether he told detectives and an Assistant State's Attorney (ASA) "about what happened" the day following Pitts's shooting and whether he told the grand jury "what happened" weeks later. Damont was asked similar questions and answered, "yes." Likewise, Derrick gave affirmative responses to the prosecutor asking whether he gave a videotaped statement "about what happened that night." Ryan answered "yes" that he gave statements, including a video recorded statement, to a detective and ASA "regarding this" at a CPD station the night of the shooting. Nina was asked similar questions and indicated that she had given a video recorded statement. During Christopher's and Nina's testimonies, defense counsel objected to the questioning. The trial court overruled both objections. The issue was raised following Damont's testimony, and the court explained that it would permit the questioning. Although none of the witnesses testified to the content of their prior statements, Williamson contends their affirmative responses amounted to evidence that each witness gave a prior statement consistent with their trial testimony. He argues the State elicited this evidence to improperly bolster their credibility, as shown by its closing argument, which expressly implored the jury to find their witnesses credible because their trial

testimony was the same as "what they told the police right away." Moreover, Williamson contends that he was prejudiced by the admission of such statements since the evidence was close.

¶ 30        Evidence of a witness's prior consistent statement is generally inadmissible to bolster the credibility of the witness's trial testimony. *People v. Doehring*, 2021 IL App (1st) 190420, ¶ 100. This rule is designed to prevent the danger that the jury will attach greater merit to testimony than it deserves simply because it has been repeated. *Id.* Prior consistent statements may be admitted, however, to rebut a charge or inference "that the witness was motivated to testify falsely or that their testimony was of recent fabrication where the witness told the same story before the motive came into existence or before the time of the alleged fabrication." *Id.* ¶ 101; Ill. R. Evid. 613(c) (eff. Sep. 17, 2019). In accord with this limited purpose, prior consistent statements may only be admitted for rehabilitative purposes, not as substantive evidence. *Id.* A trial court's ruling regarding the admission of a prior consistent statement is reviewed for an abuse of discretion. *Id.* ¶ 104.

¶ 31        We observe that the State does not contest that the challenged testimony constitutes prior consistent statements. Affirmative responses to questions suggesting a prior consistent statement implicate the rule even if the content of the prior statement is not offered. See *id.* ¶¶ 107, 109 ("one-word affirmation" to " 'So you didn't tell [the police] at first but you did tell them later?' " was a prior consistent statement); see also *People v. Crockett*, 314 App. 3d 389, 407 (2000) (finding the State's phrasing of a question elicited evidence of a prior consistent statement to bolster testimony even though the content of the statement was not elicited). Indeed, the responses Williamson challenges on appeal each implied that the witness previously gave a statement consistent with their trial testimony.

¶ 32        The State argues that evidence of Derrick's, Ryan's, and Nina's prior statements was admissible to rebut the defense's theory that their testimony was fabricated, and Christopher's and

Damont's prior statements were admissible as statements of identification since the statements were made contemporaneous with their identifications of Williamson. We reject both contentions.

¶ 33 Evidence of prior consistent statements made by Derrick, Ryan, and Nina was elicited on direct examination. This alone does not render their testimony afoul of the rule. When defense counsel's opening statement suggests that State witnesses will provide fabricated testimony or had a motive to give false testimony, defense counsel may be found to have "paved the way" for admission of prior consistent statements on direct examination. *Doerhing*, 2021 IL App (1st) 190420, ¶¶ 107, 109. Defense counsel's opening statement in this case, however, did not suggest a *recent* fabrication or motive to testify falsely. Defense counsel argued that Christopher shot Pitts in an altercation that began when Marcus accosted Pitts about owing him money. Counsel implied that the State witnesses who were aligned with Christopher and Marcus—Derrick, Ryan, and Nina—had lied from the beginning to protect Christopher and Marcus. To admit prior consistent statements, it is not enough that the opposing party argues or implies that a witness is testifying falsely or has a motive to. The prior consistent statement must have been made *before* the putative fabrication or motive existed. *Id.* ¶ 103. Here, Derrick's, Ryan's, and Nina's alleged motive to protect Christopher and Marcus existed prior to any of their proffered statements. To the extent that defense counsel was implying a fabrication, it was not a recent fabrication, but a fabrication from the outset. As such, counsel did not pave the way for admission of prior consistent statements. Accordingly, the conditions for admission of these statements were not met and the statements should not have been admitted.

¶ 34 Similarly, we disagree that Christopher's and Damont's affirmative answers that they told detectives, ASAs, and the grandy jury "what happened" were admissible as statements of identification. Prior consistent statements are admissible if otherwise permitted by the rules of

evidence. Ill. Evid. R. 613(c). Prior statements of identification are admissible under Illinois Rule of Evidence 801(d)(1)(B) (eff. Oct. 15, 2015) and section 115-12 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-12 (West 2020)). Our supreme court has defined "statements of identification" broadly to encompass "the entire identification process." *People v. Myers*, 2023 IL App (1st) 210642, ¶ 63 (quoting *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002)). However, this exception does "not allow the admission of every discussion between a [witness] and a police officer, only those pertaining to identification of a person made after perceiving him." *Id.* (quoting *People v. Newbill*, 374 Ill. App. 3d 847, 853 (2007)). "[T]he testimony may include a description of the offense only to the extent necessary to make the identification understandable to the jury, but it may not go beyond that to provide detailed accounts of the actual crime." (Internal quotation marks omitted.) *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 42.

¶ 35         Here, Christopher's and Damont's statements—despite being made on occasions in which each witness identified Williamson—were not part of the identification process itself and instead pertained to the witnesses' accounts of the crime. We also find the State's reliance on prior identification unpersuasive since identity was not as issue in this case. There was no apparent purpose in eliciting evidence of the witnesses' prior consistent statements other than to bolster the credibility of their testimony. The State's closing argument underscores that this was its purpose.

¶ 36         We also reject that the statements were admissible to explain the course of investigation. That exception only applies when police conduct is otherwise inexplicable. See *People v. Williams*, 2023 IL App (1st) 192463, ¶¶ 101-102; see also *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107 (" '[O]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information.' "). These statements were not necessary to explain any police conduct.

For these reasons, the evidence of prior consistent statements from Christopher and Damont should not have been admitted.

¶ 37    The erroneous admission of prior inconsistent statements, however, is subject to harmless error analysis. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104. Since such error is evidentiary in nature as opposed to constitutional, we will find the error harmless if there is no reasonable probability that the jury would have acquitted the defendant absent the error. *Id.*; *People v. McBride*, 2020 IL App (2d) 170873, ¶¶ 34, 37.

¶ 38    We find that the improperly admitted evidence of prior consistent statements was harmless. Our supreme court has recognized that the prejudicial effect is minimized when a witness testifies to their own prior statements as opposed to another witness corroborating the statement. *People v. Henderson*, 142 Ill.2d 258, 311 (1991). A witness testifying to their own prior statement does not truly enhance their credibility. *Id.* Here, each witness who testified to evidence of a prior consistent statement did so regarding their own statement. Thus, the improper evidence failed to give the jury a basis to find each witness more credible than they would have without the evidence of their prior statement. Indeed, any potential effect on the jury's credibility assessment was superseded by the fact that seven witnesses gave materially consistent accounts. In addition, the improper questions and answers were brief and did not elicit specific evidence of what each witness had previously said. *Id.* at 312 (noting that unspecific evidence of a witness's prior consistent statement "minimize[d] the prejudiciality"). Accordingly, we do not believe there is a reasonable probability that the jury would have acquitted Williamson absent the improperly admitted evidence of prior consistent statements.

¶ 39    In addition, it is important to note that the critical issue here pertained to the circumstances of Williamson's and Pitts's entry into the home. To convict Williamson of murder under its felony

murder theory, the State had to prove that he and Pitts were committing home invasion when Pitts was shot. A person commits home invasion, in relevant part, by knowingly entering the dwelling place of another without authority, knowing at least one person is present, and the person either uses or threatens force or intentionally causes injury. 720 ILCS 5/19-6(a) (West 2014). In Williamson's account, he and Pitts went to the house to buy marijuana and were permitted to enter. In the account of the State's witnesses, Williamson forced his way in to rob Christopher, over Christopher's attempt to keep him from entering.

¶ 40    Williamson argues that the evidence was closely balanced as to whether he entered without authority. In support, he asserts that only Marcus and Andrew corroborated Christopher's testimony that Williamson forced his way in while Christopher pushed against the door. Further, both Marcus and Andrew were impeached with prior statements omitting such details. Williamson asserts that the jury's note during its deliberation stating it could not reach unanimous agreement indicated that the evidence was closely balanced.

¶ 41    We disagree that this case was closely balanced. In addition to Marcus and Andrew, Ryan and Damont testified that they observed Christopher push against the door while an arm holding a gun was sticking through. Neither Ryan nor Damont was impeached. Further, although Derrick and Nina did not testify to directly observing Williamson force his way in, their testimonies supported an inference that he had entered without authority. Derrick, who was not paying attention to the door, heard a physical altercation and the word "gun" shouted, prompting him to flee the house. Thus, his account suggests an abrupt violent occurrence more consistent with a forcible entry. Similarly, Nina's account of observing an armed man with a skull cap partially covering his face while demanding Christopher and Marcus "give [him] the s***" supports that the men had forced their way in for a robbery.

¶ 42        In any event, no witness corroborated Williamson's account that Christopher allowed him to enter, that Marcus accosted Pitts, or that either Williamson or Pitts was unarmed. The recovered evidence also refuted Williamson's testimony that he and Pitts were simply there to buy marijuana. Williamson said he gave Pitts $20 for the purchase, but no cash was found on either man's person or among their personal items. In addition, Sergeant Lopez found Pitts with a cap partially covering his face, consistent with the State's witnesses' testimonies and supporting an inference that Pitts was there to commit a robbery.

¶ 43        Lastly, the fact that the jury indicated it could not reach a unanimous agreement before they reached their verdict does not by itself demonstrate that the evidence was closely balanced. See, *e.g.*, *People v. Ehlert*, 274 Ill. App. 3d 1026, 1035 (1995) (jury's note was one factor along with lengthy deliberations and "considerable evidence" that the defendant did not cause the decedent's death for the court to find the evidence was closely balanced). Considering the evidence and trial record here, the jury's note does not lead us to conclude that the evidence was closely balanced.

¶ 44                                B. Ineffective Assistance

¶ 45        We turn to Williamson's claim that he was denied effective assistance of counsel. He asserts that trial counsel's performance was deficient for failing to object to the State's introduction of Marcus's grand jury testimony on redirect examination. Like the previous claim, Williams asserts that Marcus's grand jury testimony was an inadmissible prior consistent statement since there was no suggestion of recent fabrication or that Marcus acquired a motive to testify falsely after he testified before the grand jury.

¶ 46        To demonstrate ineffective assistance of counsel, a defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant. *People v. Jackson*, 2020 IL 124112, ¶ 90. Since a

defendant must satisfy both prongs, a claim can be disposed of on the prejudice prong alone. *Id.* ¶ 91. Prejudice in this context means that there is a reasonable probability that the result of the proceeding would have been different absent counsel's deficient performance. *Id.* ¶ 90.

¶ 47   Here, defense counsel impeached Marcus with his video recorded statement omitting any mention of viewing Christopher struggling at the door to prevent an armed man from entering, as he testified on direct examination. As in our discussion of the previous claim, a witness's impeachment with a prior *in*consistent statement alone is insufficient to admit evidence of a prior consistent statement. *People v. Richardson*, 348 Ill. App. 3d 796, 802 (2004). There must be a charge or inference of recent fabrication or a motive to give false testimony that arose after the statement. *Id.* Here, defense counsel did not suggest recent fabrication, or a post-statement motive to testify falsely. Rather, counsel charged that Marcus was untruthful all along. Thus, counsel had a reasonable basis to object to the State's introduction of Marcus's prior consistent statements to the grand jury and such an objection should have been sustained.

¶ 48   However, we do not believe Williamson was prejudiced by the introduction of Marcus's statements before the grand jury. The evidence amounted to Marcus corroborating his own statement. Four other witnesses—Christopher, Damont, Ryan, and Andrew—all similarly testified to Williamson's forcible entry. As noted, the evidence was not closely balanced and there is no reasonable probability that the result of the trial would have been different. Therefore, we find that Williamson has failed to demonstrate that he was denied the effective assistance of counsel.

¶ 49                                   C. Speedy Trial

¶ 50   Last, we address Williamson's speedy trial claim. The speedy trial statute provides that a defendant in custody must be tried within 120 days of their arrest. 725 ILCS 5/103-5(a) (West 2018). The appropriate remedy for a violation is dismissal of the charges. *People v. Ladd*, 185 Ill.

2d 602, 607 (1999). The 120-day period begins to run automatically from the date of arrest. *Williams*, 2023 IL App (1st) 192463, ¶ 84. However, the period is tolled during any time when the defendant causes, contributes to, or agrees to a delay. *Id.* ¶ 82.

¶ 51    Williamson first argues that the supreme court's emergency orders tolling the speedy trial statute exceeded its constitutional authority by, *inter alia*, violating principles of separation of powers. After briefing in this case, the supreme court addressed a similar speedy trial claim challenging its emergency orders in *People v. Mayfield*, 2023 IL 128092. There, the court concluded that its COVID-19 emergency orders were within its administrative authority over court procedure conferred by the State constitution. *Id.* ¶ 36. Williamson's argument does not materially differ from the claims argued in *Mayfield*. Since Mayfield definitively settled the issue, we need not address Williamson's constitutional argument any further.

¶ 52    Alternatively, Williamson argues that since Chief Judge Evans ordered that trials could resume in Cook County in March 2021, Williamson's April 30, 2021, trial demand was effective and the days from then on counted toward the 120-day period. As his trial began 157 days later, on October 4, 2021, he insists the 120-day period was exceeded. The State counters that only 46 days between Williamson's arrest and trial could be counted due either to continuances Williamson agreed to or time when the Speedy trial statute was tolled by the supreme court's emergency orders.

¶ 53    Both parties agree that the 42 days from Williamson's arrest until his arraignment in January 2016 counted toward the 120-day period. Williamson contends the count resumed on April 30, 2021, when he demanded trial after Chief Judge Evans ordered trials could resume. The State contends the count resumed on October 1, 2021, based on the supreme court's amended order stating that only days prior to March 20, 2020, and on or after October 1, 2021, could be included in speedy trial computation. We agree with the State. Chief Judge Evans's order permitting trials

to resume in March 2021 did not countermand the supreme court's order tolling the speedy trial statute, which was in effect at the time. Although the supreme court gave Chief Judges authority to permit trials to resume, it did not give them authority to alter its order regarding speedy trial computation. Thus, Williamson's April 30, 2021, trial demand did not restart his 120-day count. Rather, the count resumed on October 1, 2021, in accordance with the supreme court's order. So, only the four days from then until Williamson's trial began could be added to the prior 42 days that had elapsed, meaning he was brought to trial within 46 days. All other periods were agreed continuances or time when the speedy trial statute was tolled pursuant to supreme court order. For these reasons, we find that Williamson was tried within the time allowed by statute.

¶ 54                                   III. CONCLUSION

¶ 55        Based on the foregoing, we affirm the judgment of the trial court.

¶ 56        Affirmed.