2026 IL App (4th) 250498-U

NO. 4-25-0498

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
March 26, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Fulton County |
| FRANKIE D. TENNISON, | ) | No. 24CF55 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas B. Ewing, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed defendant's convictions and remanded for a new trial, as (1) the trial court committed plain error when it failed to admonish potential jurors as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and (2) defense counsel was ineffective for failing to object to the State's prejudicial use of excluded hearsay testimony during closing arguments.

¶ 2    Defendant, Frankie D. Tennison, was found guilty by a jury of possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(1) (West 2024)), possession of methamphetamine (720 ILCS 646/60(a) (West 2024)), and unlawful delivery of methamphetamine (720 ILCS 646/55(a)(1) (West 2024)). On appeal, he argues that (1) the trial court committed first-prong plain error by failing to ask jurors whether they understood and accepted the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984), as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (2) defense counsel was ineffective for failing to object when the State presented hearsay evidence indicating defendant was the target of a search warrant; and (3) defense

counsel was ineffective for failing to object when the State vouched for the credibility of one of its witnesses. For the following reasons, we reverse defendant's convictions and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4        On March 18, 2024, the State charged defendant with possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(1) (West 2024)) (count I), possession of methamphetamine (720 ILCS 646/60(a) (West 2024)) (count II), unlawful delivery of methamphetamine (720 ILCS 646/55(a)(1) (West 2024)) (count III), and unlawful possession of a controlled substance (buprenorphine) (720 ILCS 570/402(c) (West 2024)) (count IV). The State alleged that on March 15, 2024, defendant possessed between 100 and 400 grams of methamphetamine, delivered a substance containing methamphetamine to Madison Hallmark, and possessed less than 15 grams of a substance containing buprenorphine.

¶ 5        A jury trial began on November 18, 2024. The State moved to dismiss count IV, possession of a controlled substance containing buprenorphine. The trial court then called in the jury venire and began *voir dire*.

¶ 6                                   A. *Voir Dire*

¶ 7        The trial court called seven panels of prospective jurors. The court informed the prospective jurors, with some variation between panels:

> "The charge that you have heard must not be considered as any evidence against the defendant. In fact, under the law[,] [t]he presumption is just the opposite. Every defendant is presumed innocent. It's presumed these charges are not true. The presumption of innocence remains with the defendant throughout every stage of the trial, even during your deliberations on the verdict. This presumption of

innocence is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout every stage of the proceedings.

The defendant is not required to prove his innocence, nor is he required to present any evidence alone. He may simply rely on the presumption of innocence. Moreover, a defendant has a constitutional right not to testify, and the jury may not draw any inference of guilt if the defendant does not testify. The defendant has pleaded not guilty. You will be asked to decide his guilt or innocence of the charge if you are selected as a trial juror in this case."

Despite these prefatory remarks, and contrary to the requirements of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the court did not ask any members of the venire who were ultimately selected for the jury whether they both understood and accepted all required *Zehr* principles. Indeed, the court never asked some jurors whether they understood and accepted *any* of these principles. Once the jury was selected, the parties began presenting evidence on November 19, 2024, and continued on November 20, 2024.

¶ 8                                B. Opening Statements

¶ 9        The State began its opening statement by saying, "My main role here in this trial is to provide you guys with the truth." The State then gave a summary of the evidence the jury would hear. When the State came to describe Hallmark's testimony, the prosecutor stated:

"And when we did the jury selection, a lot of you guys kind of expressed, oh, an issue with people that decide to participate in illegal drugs. I ask that you just have

an open mind and heart for [Hallmark] when you hear her. I believe you will find that she is genuine and she is trying to do the right thing."

Defense counsel did not object to these remarks. After defendant's opening statement, outside of the presence of the jury, the trial court stated to the parties:

"One thing I want to note. [State], I listened closely to your opening, and I heard you say: I believe you will find the, talking about the witnesses, that they are genuine, and so on. I think you—I want to caution you. I didn't hear any objection. I didn't expect to. I want to caution you, as the State, you cannot vouch for witnesses as the State. I know that [defense counsel] understands that, and it does not appear anything that you said crossed the line. But, *** that's a significant problem if that occurs in the closing argument."

The State acknowledged the court's warning.

¶ 10                                    C. Testimony

¶ 11                                    1. *Hallmark*

¶ 12        The State first called Hallmark. She testified that on March 15, 2024, she went to 615 West Avenue E in Lewistown, Illinois, "[t]o purchase drugs" from defendant. She had been there three or four times before and believed defendant lived there, but he was not there the previous times she was there. When Hallmark arrived on March 15, 2024, defendant was expecting her and instructed her to go through the side door. She "put money on the table and started getting high" on methamphetamine she purchased from defendant. Defendant pulled a bag out of a sock that contained "a crystal-like substance." The State showed Hallmark a picture of a sock, and she testified that it looked like the one that defendant had. According to Hallmark, she then smoked methamphetamine out of a bong that defendant gave to her. She testified that defendant "had a

- 4 -

friend stop by" briefly. Afterwards, Orion Atchley stopped by and sat and smoked with Hallmark for 10 to 15 minutes. At some point, defendant left the room and returned with a scale, which Hallmark identified from a photograph during her testimony. Hallmark claimed that defendant then placed a white cup on the scale, removed something from a bag inside of a black cloth that was inside of the sock, placed it on the scale, then put it into a sandwich bag. Hallmark testified that she later received the exact same kind of sandwich bag from defendant, which contained 3.77 grams of methamphetamine. While she was sitting at the table, defendant reloaded the bong with methamphetamine twice from the bag inside the sock on the table.

¶ 13          While Hallmark was still smoking, defendant took a shower. After he returned, the police arrived at the residence. Leaving her phone on a table, Hallmark ran to a nearby window and jumped out of it but did not get very far before a deputy stopped her. She had the bag containing her methamphetamine in her bra, which she threw into some cinder blocks outside of the house. While she was in custody and being interrogated, she saw another deputy "walking by with a sock," which she recognized as defendant's sock.

¶ 14          On cross-examination, Hallmark admitted that she was convicted in 2018 for possession of methamphetamine precursors and served a prison sentence. On redirect examination by the State, she said that she was "[a]bsolutely" trying to "get better," had looked into going to school, and believed that she paid the price for her previous conviction.

¶ 15                              2. *Law Enforcement*

¶ 16          The State also called Jon Webb, Chris Ford, Joshua Adkins, Tyler Willdrick, Brock Vogel, and Preston Harris of the Fulton County Sheriff's Office, as well as Martin Palomo from the Illinois State Police Forensic Science Laboratory in Morton, Illinois. A summary of their testimony follows.

¶ 17        Law enforcement executed a search warrant at 615 West Avenue E in Lewistown on March 15, 2024. Webb, the sheriff of Fulton County, testified that they were "looking for methamphetamine" that "was supposedly in a black sock." The State played his body camera video for the jury, which the trial court admitted over defendant's objection due to a lack of foundation. The video showed the officers searching through a very cluttered house and finding a black sock at the bottom of a rolled-up carpet. In the video, Webb said, "I think he threw it in there," and, "There's a black sock in there that looks awful heavy." Webb testified the black sock was of interest to the officers "[b]ecause that's what, we were told that [defendant] kept his meth in." Defense counsel objected to that testimony on hearsay grounds, and the court sustained the objection. The State then asked Webb if he "found what [he was] looking for in the carpet," and Webb said he did, as he found methamphetamine and two scales. Webb identified the sock, scales, and bag of methamphetamine in court as the objects he found at the house.

¶ 18        Ford, a lieutenant with the Fulton County Sheriff's Office, testified that no one answered the door to the residence when law enforcement knocked on the door, so they had to breach the door using a breaching tool. Ford testified that once they breached the door, "the occupant of the house came to the door," whom he identified as defendant. The house was very cluttered. Ford testified that they were looking for methamphetamine and that "information came in while we were on the scene that we were looking for a black sock that contained," but was cut off by defense counsel's objection on hearsay grounds, which the trial court again sustained. The State then asked, "Were you looking for a black sock with methamphetamine?" and Ford answered, "Yes." Ford testified that they found the black sock, which contained methamphetamine. He did not find any items in the residence, such as mail, that had defendant's name on them. Ford additionally stated that he had patrolled the property before and after the

warrant was executed. Beforehand, "[t]here was foot traffic, vehicle traffic in and out of the residence on a regular basis." Afterward, "there's been no traffic, no foot traffic or vehicle traffic at the residence that [he had] observed."

¶ 19      Adkins, a patrol sergeant with the Fulton County Sheriff's Office, testified that when he was assisting with executing the search warrant at the property on March 15, 2024, he "witnessed a female exiting the window of that residence," who he later discovered was Hallmark. He saw her put something in some cinder blocks near the house, where he then found a baggie of methamphetamine.

¶ 20      Palomo, a forensic scientist at the Illinois State Police Forensic Science Laboratory in Morton, was tendered by the State and accepted by the trial court as an expert "[f]or purposes of chemistry at the laboratory." He analyzed the two bags of drugs found on the property. One weighed 194.598 grams, and the second weighed 3.6 grams. Both tested positive for methamphetamine.

¶ 21      The State then rested its case. Defendant made a motion for a directed verdict on all three counts, arguing that there was no evidence that he owned or resided at the property where the drugs were found. The trial court denied the motion based on Hallmark's testimony that she observed defendant with the methamphetamine, he took a shower there, and he was present at the residence.

¶ 22                                                *3. Defense Witnesses*

¶ 23      Defendant chose not to testify in his own defense but called three witnesses. Brian Morris testified that he was defendant's cousin and that defendant had lived in a camper on his property for a year and a half. He stated that defendant had been "working on a house in Lewistown" for six or seven months.

¶ 24        Samantha VanMiddlesworth testified that she was defendant's friend and said that he lived in a camper in a trailer park. He worked in construction and had been working on a house on West Avenue E for about a year. She explained that she gave him rides to that house fewer than 10 times. Defendant had previously stayed the night at that residence.

¶ 25        Atchley testified that he was defendant's friend. He explained that defendant lived in Manito, Illinois, and worked in construction. He reiterated that defendant had been working on a house on Avenue E and that he and his girlfriend had driven defendant to that property a few times. Atchley testified that "as far as [he] can remember, [he doesn't] think [he] was" at the house on West Avenue E on March 15, 2024, but if he was, "it would have only been in to ask [defendant] if he was ready to go 'cause we was supposed to be giving him a ride home that day." However, Atchley said "that never ended up taking place," and he "just spoke with [defendant] on the phone." Atchley admitted that he pleaded guilty to possession of methamphetamine earlier that year.

¶ 26                        D. Closing Arguments and Jury Verdict

¶ 27        During closing arguments, the prosecutor said:

        "So, I told you guys at the beginning of this trial in my opening statement that my goal in this trial was to provide you guys with the truth so you can make a decision at the end of this trial.

                                * * *

        I told you you would hear testimony from [Hallmark] of how she, although made some poor choices that day, one of which was exchanging U.S. currency for methamphetamine, she is trying to do better, and she's, this was her atonement."

Regarding the search warrant and the sock, the prosecutor also said, "I told you how the deputies found what they were looking for, which was the defendant's methamphetamine, that was stored

inside of his sock," and that "[the sock] is what the Fulton County deputies were looking for when they executed that warrant, a large amount of methamphetamine in a sock."

¶ 28　　　　In response, defense counsel argued that Hallmark was not credible because she was a methamphetamine addict and was motivated to lie. Counsel acknowledged that "[w]e know law enforcement was looking for methamphetamine in a sock." He argued that defendant was "merely present in that home with that methamphetamine," but that "mere presence when a crime is being committed does not make you guilty of that crime." He emphasized that defendant worked at the property but did not live there, and "if you're just there 'cause you're working on a house and a house as cluttered as that, you don't know what's there." He contended that Hallmark was "there not because she was in there and given free meth and buying $40 worth of met[h] from [defendant]," but "because she knows that meth is there because it's hers." He posited that Hallmark was the person who told law enforcement that the methamphetamine was in a sock. He also emphasized that law enforcement did not seize any other evidence, such as money, empty bags, or Hallmark's cell phone, which she left behind when she jumped out of the window. The police also did not test any of the physical evidence for fingerprints or DNA evidence.

¶ 29　　　　In rebuttal, the State argued that the officers already had a search warrant to look for methamphetamine before they apprehended Hallmark outside of the house and that it was irrelevant whether defendant resided at this property. The State reiterated that the officers "came into the house looking for methamphetamine in the sock; and that's what they found; and that's what they took." The State also emphasized, "As I said, as I stated before, the police were already on their way to the house before they even knew [Hallmark] was there, before they even made contact with [Hallmark]. They were there to search for the defendant's drugs." The prosecutor argued that Hallmark's "story fits together perfectly."

¶ 30 The trial court instructed the jury, among other things:

"Only you are the judges of the believability of the witnesses and the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony, considered in the light of all the evidence in the case.

Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 31 The jury found defendant guilty on all three counts.

¶ 32 E. Posttrial Proceedings

¶ 33 On February 4, 2025, defendant filed a motion for a new trial. Among other points, he argued that (1) the State deprived him of his right to a fair trial when it vouched for the credibility of Hallmark in its opening statement and (2) the trial court erred when it did not strictly comply with Rule 431(b) by failing to obtain responses from all the prospective jurors about understanding and accepting the *Zehr* principles. The court denied the motion on February 12, 2025, and proceeded to sentencing. The court ultimately sentenced defendant to 25 years in prison on count I (possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(1) (West 2024))) and 3 years on count III (unlawful delivery of methamphetamine (720 ILCS 646/55(a)(1)

(West 2024))), to run concurrently. Count II (possession of methamphetamine (720 ILCS 646/60(a) (West 2024))) merged into count I (possession of methamphetamine with intent to deliver). The court also imposed fines of $10,000 on count I and $100 on count III. Defendant filed a motion to reconsider his sentence on March 14, 2025. The court denied the motion at a hearing on May 9, 2025.

¶ 34    This appeal followed.

¶ 35                              II. ANALYSIS

¶ 36    On appeal, defendant argues that (1) the trial court committed first-prong plain error by failing to ask the jurors whether they understood and accepted the principles from *Zehr*, as required by Rule 431(b); (2) defense counsel was ineffective for failing to object when the State presented hearsay evidence indicating defendant was the target of a search warrant; and (3) defense counsel was ineffective for failing to object when the State vouched for the credibility of one of its witnesses.

¶ 37                       A. Compliance with Rule 431(b)

¶ 38    Defendant first argues that the trial court failed to properly admonish potential jurors of the four *Zehr* principles pursuant to Rule 431(b). He admits he did not preserve this issue for appeal but contends that we may review it under the first prong of the plain-error doctrine. See *People v. Birge*, 2021 IL 125644, ¶ 23. An unpreserved error may be considered on appeal under the plain-error doctrine if (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Birge*, 2021 IL 125644, ¶ 24. The defendant

- 11 -

bears the burden of persuasion under both prongs. *Birge*, 2021 IL 125644, ¶ 24. However, the Illinois Supreme Court has held that a "Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby*, 2017 IL 119445, ¶ 52. The first step under the plain-error doctrine is determining whether a clear or obvious error occurred. *Birge*, 2021 IL 125644, ¶ 24.

¶ 39　　　　Rule 431(b) was adopted to ensure compliance with the requirements of *Zehr*. See Ill. S. Ct. R. 431(b), Committee Comments (rev. July 1, 2012). The rule establishes:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

We review the trial court's compliance with Rule 431(b) *de novo*. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010).

¶ 40　　　　The supreme court has stringently applied Rule 431(b), finding that the rule "mandates a specific question and response process." *Thompson*, 238 Ill. 2d at 607. It is clear error when the trial court fails to ask jurors whether they "understand and accept" the *Zehr* principles. See *Thompson*, 238 Ill. 2d at 607, 613 (finding clear error where the court failed to ask prospective jurors whether they understood and accepted each of the four principles); *Sebby*, 2017 IL 119445, ¶ 49 (finding clear error where court asked whether jurors " 'had any problems with' " or " 'believed in' " the *Zehr* principles instead of whether they "understand and accept" them). Here,

the State concedes that the court failed to ask any of the prospective jurors drawn from the first four panels whether they accepted any of the *Zehr* principles. We agree. In fact, it is clear from the record that the court did not ask any member of the venire who was ultimately selected for the jury from any panel whether they understood and accepted all four of the principles. This was clear error.

¶ 41 Having determined that a clear and obvious error occurred, defendant is entitled to a new trial if the evidence at trial was closely balanced. In determining whether the evidence is closely balanced, "a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case." *People v. Belknap*, 2014 IL 117094, ¶ 52. This analysis "does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Sebby*, 2017 IL 119445, ¶ 60. "For purposes of plain-error analysis, 'closely balanced' means that the key testimony is uncorroborated by extrinsic evidence and the testimony presents a choice between competing and plausible accounts." *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 103. However, "[a]lthough defendant has the burden before this court to show that the evidence is closely balanced, he had no burden to present any evidence or to testify himself at trial." *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007).

¶ 42 Ultimately, the evidence in this case was closely balanced. This case is similar to *Piatkowski*, where our supreme court held that the evidence was closely balanced even though the defendant presented no alibi and only one witness's testimony, because the State "presented no physical evidence to connect [the] defendant to the shooting" and the "only evidence linking [the] defendant to the crime was the testimony of the two eyewitnesses," which were questionably reliable and credible. *Piatkowski*, 225 Ill. 2d at 567-70.

¶ 43 Here, the central issue was whether the drugs found in the residence were

defendant's drugs, and the only witness to testify directly to that issue was Hallmark. Though some of the defense witnesses supported Hallmark's testimony that defendant worked at the residence and possibly stayed there overnight, Atchley's testimony contradicted Hallmark's as to whether he was there on the day in question before the police executed the search warrant. Hallmark's credibility was further challenged by her previous drug-related conviction, the fact that she was high during the events of that day, the fact that she discarded methamphetamine as she tried to flee from the police, and the fact that she had an incentive to distance herself from the drugs found inside the residence. There was no other evidence linking defendant to the black sock or scales, such as DNA or fingerprint evidence, Hallmark's phone, any text messages between defendant and Hallmark, or a wad of cash or baggies. Moreover, the strongest evidence that the State used to corroborate Hallmark's testimony in its closing argument was excluded hearsay testimony, as discussed in the next section. Under these circumstances, where the evidence was close and defendant ultimately chose not to testify, it is possible that the trial court's failure to comply with Rule 431(b) tipped the scales and prejudiced defendant. See *Sebby*, 2017 IL 119445, ¶ 78 ("It is not inevitable that a jury who receives faulty instructions on the *Zehr* principles is biased [citations], but it is possible. And if it is possible, it is also possible that those faulty instructions contributed to the result."). As a result, we must reverse defendant's convictions and remand for a new trial.

¶ 44    It is critical that trial courts exercise diligence when admonishing potential jurors under Rule 431(b), especially in those cases involving charges and rights as serious as those at issue here. The easiest way to ensure compliance with the rule is to question the venire using the precise language chosen by the Illinois Supreme Court and to elicit affirmative responses from every prospective juror. See *People v. Neal*, 2020 IL App (4th) 170869, ¶¶ 188-89 (acknowledging

that "[b]eing a trial judge can be a difficult job, often requiring careful study to properly apply difficult legal concepts and to ensure that a jury is properly instructed on the law" but emphasizing that "there is no excuse for a trial judge to not strictly comply with the clear and explicit directions the supreme court has provided for trial courts when admonishing prospective jurors"). Likewise, both defense counsel and prosecutors must be aware of the strict requirements of Rule 431(b) so that they can recognize any improper deviation from the rule and request the trial court to immediately rectify the error.

¶ 45                              B. Hearsay Evidence

¶ 46        Defendant also argues that his trial counsel was ineffective for failing to object to hearsay testimony that police officers were executing a search warrant to look for defendant's drugs in a black sock, as well as the audio from the body camera video of the officers' use of the pronoun "he" while referring to the owner of the black sock. For the following reasons, we hold that this issue presents separate grounds for reversal.

¶ 47        Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a defendant to prove that (1) trial counsel's performance was deficient and (2) defendant was prejudiced by it. Under the first prong, counsel's performance is deficient only if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A court's review of counsel's performance "must be highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and constitutes sound trial strategy. *Strickland*, 466 U.S. at 689. A mistake or error in judgment alone does not render representation constitutionally defective; it must rise to the level of failing " 'to conduct meaningful adversarial testing of the State's case.' " *People v. Peterson*, 2017 IL 120331, ¶ 80 (quoting *People v. Perry*, 224 Ill. 2d 312,

355 (2007)). Under the second prong, there must be a reasonable probability—that is, a probability "sufficient to undermine confidence in the outcome"—that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Though a defendant needs to satisfy both prongs to prevail, a court does not need to address deficient performance if the defendant did not suffer sufficient prejudice. See *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991).

¶ 48        "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted." *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004). Hearsay is generally excluded because of "the lack of an opportunity to cross-examine the declarant" (*Jura*, 352 Ill. App. 3d at 1085), which is a guaranteed right under the confrontation clauses of both the United States and Illinois Constitutions. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; see also Ill. R. Evid. 802 (eff. Jan. 1, 2011) ("Hearsay is not admissible except as provided by these rules.").

¶ 49        However, police officers are allowed to " 'testify about statements made by others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted, but is instead used to show the investigative steps taken by the officer leading to the defendant's arrest.' " *Jura*, 352 Ill. App. 3d at 1085 (quoting *People v. Pulliam*, 176 Ill. 2d 261, 274 (1997)). Courts have cautioned that this rule is not meant to allow the State to introduce out-of-court statements that prejudice the defense just because someone told a police officer that information during an investigation:

> " 'Although a police officer may reconstruct the steps taken in a crime's investigation and may describe the events leading up to the defendant's arrest where such testimony is necessary and important to fully explain the State's case to the jury [citation], there is a distinction between an officer testifying to the fact that he

spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation. [Citation.] Under the investigatory procedure exception, the officer's testimony must be limited to show how the investigation was conducted, not to place into evidence the substance of any out-of-court statement or conversations for the purpose of establishing the truth of their contents. [Citation.] The police officer should not testify to the contents of the conversation [citation], since such testimony is inadmissible hearsay.' " *Jura*, 352 Ill. App. 3d at 1085 (quoting *People v. Trotter*, 254 Ill. App. 3d 514, 527 (1993)).

Importantly, " '[h]earsay testimony identifying the defendant as the one who committed the crime cannot be explained away as "police procedure," even where the trial judge limits the evidence to a nonhearsay purpose.' " *Jura*, 352 Ill. App. 3d at 1085 (quoting *People v. Rivera*, 277 Ill. App. 3d 811, 820 (1996)).

¶ 50        In this case, there is no question that the trial court properly sustained defense counsel's hearsay objections when Webb testified that he had received information that defendant kept methamphetamine in a black sock and when Ford began to explain what he was searching for at the residence. These statements were blatantly prejudicial hearsay that went beyond the scope of describing investigative steps, as they referenced an unknown third person reporting the crime and identified defendant as the owner of the sock. See *Jura*, 352 Ill. App. 3d at 1086 (finding that statements from three police officers that "they responded to a call of 'a person with a gun,' described as 'a male White with a tattoo with a teardrop on his face,' and that defendant 'matched that description' " were improper because they "went beyond explaining the investigative steps taken").

¶ 51        Defendant identifies additional testimony and recorded statements played for the jury that he contends constituted impermissible hearsay even though such statements did not expressly connect him to the drugs. The State contends these statements were not hearsay. However, we need not address whether defense counsel should have objected to that evidence because in closing arguments, the State clearly relied on the excluded hearsay statements of Webb and Ford as substantive evidence to establish defendant's guilt, rather than for any nonhearsay purpose, such as to explain the officers' investigatory procedure. The State argued, "I told you how the deputies found what they were looking for, which was the *defendant's* methamphetamine, that was stored inside of *his* sock," and, "They were there to search for the *defendant's* drugs." (Emphases added.) Inexplicably, defense counsel did not object to these remarks, which were prejudicial and derived from testimony that had been excluded pursuant to a sustained objection.

¶ 52        "[I]n the context of a prosecutor's arguments, a reviewing court will find reversible error 'if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error.' " *People v. Williams*, 2023 IL App (1st) 192463, ¶ 129 (quoting *People v. Jackson*, 2020 IL 124112, ¶ 83). " 'If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted.' " *Williams*, 2023 IL App (1st) 192463, ¶ 129 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)). Importantly, a prosecutor " 'exceeds the bounds of permissible argument where he comments on facts that are inadmissible.' " *Williams*, 2023 IL App (1st) 192463, ¶ 139 (quoting *People v. Shief*, 312 Ill. App. 3d 673, 679 (2000)). When deciding if an error was harmless, "courts may '(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine

whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.' " *Williams*, 2023 IL App (1st) 192463, ¶ 130 (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)).

¶ 53        In *Jura*, the court found it was particularly problematic that "[i]n addition to repeating the hearsay during the direct examination of the three police officers, the State relied on the substance of these statements in both opening statement and closing argument to prove that [the] defendant matched the hearsay description of the man with a gun." *Jura*, 352 Ill. App. 3d at 1088; see *Williams*, 2023 IL App (1st) 192463, ¶ 117 ("These remarks *** went well beyond what was necessary to explain the investigatory actions leading to [the] defendant's arrest and, instead, suggested that the hearsay statements were substantive evidence of [the] defendant's guilt of the charges for which he was on trial."); see also *People v. Singletary*, 273 Ill. App. 3d 1076, 1085 (1995) ("In the instant case the prosecutor's remarks in opening statement and closing argument *** also went beyond what was necessary to explain investigatory procedures and was used to establish [the] defendant's guilt rather than explain police conduct."). The court in *Jura* emphasized that "[i]n the instant case, the 'concerned citizen' spoke volumes, but never entered the courtroom" and "was never subjected to cross-examination." *Jura*, 352 Ill. App. 3d at 1091. Because the defendant's possession of a gun was a central issue and no other physical evidence or civilian witness testimony connected the defendant to the gun, the court found that "[t]he repeated admission of the hearsay together with the use of the hearsay by the State was highly prejudicial," and "[t]he outcome of the instant case was directly related to whether the jury believed [the] defendant or the three officers called by the prosecution." *Jura*, 352 Ill. App. 3d at 1091. Because the defendant's trial counsel failed to challenge these hearsay statements, the court found that he was ineffective. *Jura*, 352 Ill. App. 3d at 1094.

¶ 54　　　　　Although Hallmark's identification of defendant was sufficient to support his convictions, the evidence presented at trial was close, as discussed above. Other than Hallmark's testimony, there was nothing that linked defendant directly to the black sock full of methamphetamine. To be sure, defendant's own witnesses connected him to the house—but not to the drugs—and he was present at the house when the police executed the search warrant. But the police failed to collect any DNA or fingerprint evidence, Hallmark's phone, which she testified she left behind when she fled, any text messages between defendant and Hallmark arranging the sale of drugs, or the cash or baggies that were apparently also located in the residence. Moreover, Hallmark's credibility was undermined by her previous conviction, Atchley's directly contradictory testimony that he was not at the house with her that day, and the fact that she was high on methamphetamine at the time. She also discarded methamphetamine as she tried to flee from the police, and she had a strong motive to distance herself from the drugs found in the home.

¶ 55　　　　　Contrary to the State's assertion on appeal, the officers' excluded hearsay statements that the State later relied on in closing arguments were not cumulative of Hallmark's testimony. See *Jura*, 352 Ill. App. 3d at 1087 (emphasizing that "the content of the radio call, including the type of crime reported and the description of the offender, was irrelevant in light of the testimony of all three police officers that they observed defendant with a gun fleeing down the alley"). Rather, the officers' statements improperly added credence to Hallmark's testimony by supporting it with what appeared to be a second, unidentified source of information prior to or during the execution of the search warrant. We acknowledge that the trial court instructed the jury that closing arguments are not evidence; however, this improper argument went to the heart of the issue in this case—whether it was defendant who possessed the drugs—and the State's emphasis on this inadmissible evidence could have tipped the scales despite the instruction. This error also

may have compounded the prejudicial effect of the court's failure to give proper Rule 431(b) admonishments, as the jury may not have understood and accepted the four fundamental principles outlined in the rule; most importantly here, the jury may not have understood not to hold defendant's failure to testify against him. Given the totality of the circumstances, there is a reasonable probability that, had the State not relied on this improper and excluded testimony as substantive evidence in its closing argument, the jury could have found defendant not guilty.

¶ 56        Defense counsel's failure to object to the State's clearly improper arguments based on inadmissible evidence constituted deficient performance, as it essentially amounted to failing " 'to conduct meaningful adversarial testing of the State's case.' " *Peterson*, 2017 IL 120331, ¶ 80 (quoting *Perry*, 224 Ill. 2d at 355). Notwithstanding the State's argument on appeal, there is no reasonable strategic decision why defense counsel would object to the admission of the prejudicial hearsay testimony during trial but then allow the State to rely on that excluded hearsay in closing arguments to connect defendant to the drugs. Because allowing the jury to hear the State's improper closing argument could have changed the result of the trial, as discussed above, counsel's failure to object was also highly prejudicial. As a result, counsel was ineffective, and defendant was deprived of a fair trial. We therefore must reverse defendant's convictions and remand for a new trial on this ground in addition to the trial court's failure to comply with Rule 431(b).

¶ 57                              C. The State Vouching for a Witness

¶ 58        Defendant contends that his trial counsel was ineffective for failing to object when the State vouched for Hallmark's credibility during its opening statement and closing argument. Defendant focuses on a few statements made by the prosecutor, such as (1) "[m]y main role here in this trial is to provide you guys with the truth," (2) "I believe you will find that [Hallmark] is genuine and she is trying to do the right thing," and (3) "I told you you would hear testimony from

[Hallmark] of how she, although made some poor choices that day, one of which was exchanging U.S. currency for methamphetamine, she is trying to do better, and she's, this was her atonement." However, we need not reach this issue on appeal, as we are reversing on other grounds and believe this issue is unlikely to recur on remand. To that end, the State is unlikely to use the exact same phrasing when the case is retried, and defense counsel will likely be attuned to this issue and raise any appropriate objections. We remind the State not to make remarks that could be interpreted as " 'express[ing] personal beliefs or opinions or invok[ing] the State's Attorney's office's integrity, to vouch for a witness's credibility.' " *People v. Long*, 2018 IL App (4th) 150919, ¶ 96 (quoting *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66).

¶ 59                                      D. Double Jeopardy

¶ 60          While we reverse defendant's convictions, for double jeopardy purposes, we find the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. The jury was entitled to believe Hallmark's testimony; however, the clear errors present during this trial undermine our confidence that the jury only relied on properly admitted evidence in doing so. Thus, we find there is no double jeopardy impediment to a new trial. However, we reach no conclusion regarding defendant's guilt that would be binding on retrial. See *People v. Naylor*, 229 Ill. 2d 584, 611 (2008).

¶ 61                                      III. CONCLUSION

¶ 62          For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 63          Reversed and remanded.